## Bank of Pennsylvania *against* Reed.

1ws 101⟩<br>41SC 2144⟩

There being no form prescribed by the Act of Assembly in which security shall be given for a stay of execution upon a judgment, an obligation under the hand and seal of the surety entered upon the record of the judgment, binding himself for the payment of the debt, interest and costs, is sufficient to entitle the defendant to the stay provided by the Act.

The cashier of a bank has a general authority to superintend the collection of notes under protest, and to make such arrangements as may facilitate that object:—to do any thing in relation thereto that an attorney might lawfully do; but his authority would not extend to justify him in altering the nature of the debt, or to change the relations of the bank from a creditor to that of an agent of its debtor. But a subsequent acquiescence of the bank in any arrangement of its cashier would be conclusive upon it.

In a question between the holder and endorser of a note regarding the exoneration of the latter on the ground of the negligence of the holder, it is error to permit the endorser to give evidence of the ability of the payor at a period when it was not in the power of the holder to enforce payment.

ERROR to the Common Pleas of *Mifflin* county.

The Bank of Pennsylvania against William Reed and James Thompson, surviving partners of William Reed & Co. The case and points are very fully stated in the opinion of the court. The cause was argued by

*Foster* and *A. S. Wilson*, for plaintiff in error.

It is the duty of the directors, and not of the cashier, to direct the legal proceedings of the bank. 6 *Peters* 51; 8 *Peters* 12. But the bank was only bound to the exercise of ordinary diligence; it was not their duty to arbitrate the cause at all, and it would therefore follow that, even if there had been an irregularity in that

I.— I*

proceeding it would not prejudice the bank. 11 *Serg. & Rawle* 182. There was no evidence in the cause which justified the court below in submitting to the jury whether there was due diligence on the part of the bank. 11 *Johns.*188; 21 *Wend.* 644. The bank was not bound to except to the form of the recognizance, and if it had it would not have availed, for the obligation of the surety is good. 2 *Penn. Rep.* 167; 1 *Penn. Rep.* 401; 17 *Serg. & Rawle* 282; *Story on Bail.* 6.

*Benedict* and *Blanchard*, for defendants in error.

It is the duty of a cashier to make all arrangements to secure debts due to the bank. 4 *Serg. & Rawle* 16; 12 *Serg. & Rawle* 61. The evidence as to the situation and property of the payors of the note was properly received, on the ground that the recognizance for the stay of execution was a nullity, and therefore execution might have issued at any time. But how could the court determine as matter of law whether there was due diligence or not? it depended upon a variety of circumstances which could only be referred to the jury, and if they committed an error, the remedy was by motion for a new trial.

The opinion of the Court was delivered by

ROGERS, J. — This was a *scire facias*, to renew and to continue the lien of a judgment of November term 1836, to which the defendants pleaded payment, with leave, &c. The defendants alleging that they had a defence, moved the court to open the judgment; whereupon, March 5th 1840, on hearing the motion, the court discharged the rule; the plaintiff having agreed that the defendants shall have liberty to give every matter and thing in evidence in the *scire facias* suits, which they might or could have on the original judgment, if the rule had been made absolute. Both causes to be tried together. The case was this: William Reed & Co. sold pig metal to R. & P. W. Webb, of Little Britain township, Lancaster county, who gave their note at four months for $1325, payable to William Reed at the Farmer's Bank of Lancaster. This note was discounted by the officer of discount and deposit of the Bank of Pennsylvania, at Harrisburg, at the instance of William Reed, who endorsed it with his own name, and the name of William Reed & Co., and the proceeds were placed to the credit of William Reed & Co. The Webbs failed to pay the note at maturity to the Farmer's Bank of Lancaster, where it was sent for collection, and it was duly protested on the 23d August 1831, of which the defendants had notice. After this a correspondence took place between William Reed and Mr Lesley, who was the cashier of the Bank; and on the 1st September 1832, Mr Lesley writes to William Reed as follows:

" I received your favour of the 27th instant, with reference to Webbs' note. I will make the following proposition; and if you

agree to it, it may save both you and me some trouble. If you will give judgment to the bank, as *collateral security*, for the amount of $1325, protest and interest, we will engage to bring suit against the Webbs immediately, and endeavour to collect the money from them. If you would do this, I presume you and William Thompson would have no objection to join in the judgment.

"If you decline the above proposition, we will be under the necessity of commencing a suit at once against the firm of William Reed & Co. An early reply on this subject, will oblige

Yours, truly,

"T. LESLEY, *Cashier.*"

To this letter no answer appears to have been returned, and on the 14th September 1832, Mr Lesley writes to Reed & Co. as follows:

"By the mail that takes this, I have given instructions to E. Banks, Esq., of Lewistown, to endeavour to get you to give judgment to the bank for the security of the amount of R. & P. W. Webbs' note for $1325, and I trust your sense of justice will induce you to do so, and save us the unpleasant necessity of commencing suit against you at once. If you will give judgment, we will then bring suit against the Webbs, and get the money from them. I am truly yours,

"T. LESLEY, *Cashier.*"

In pursuance of these communications, on the 20th October 1832, Reed and Thompson confessed judgment to the plaintiffs for the sum of $1338.25, on the promissory note as before stated, and William Reed at the same time confessed a judgment for a like sum. To recover the amount due on these judgments, this suit is brought. On the completion of this arrangement, Mr Lesley sent the note to Lancaster, and a suit was brought to the December term following. The writ was issued on the 28th November 1832. On the 11th February 1833, the plaintiff's attorney entered a rule of reference; and, on the 26th March 1833, obtained an award of arbitrators, which was filed on the same day. On the 15th of April, 1833, on which day the time to appeal expired, bail was entered for the stay of execution in these words:

"I, William Webb, of Little Britain Township, hereby become bail for the amount of the award in this action, together with the interest that may accrue, and the costs. Witness my hand and seal, this 15th April 1833.

"WM. WEBB. [SEAL].

"*Test.* CHRISTIAN BARTRAM."

The suit against the Webbs was brought in the name of the endorsers; and, in consequence of a defence made against them, the award was only for the sum of $1236.20, which was less than

the amount due; but this is immaterial, as the award for this amount was accepted by William Reed.

The stay of execution on the judgment expired on the 4th December 1833; and, on the 5th December, the plaintiffs' attorney issued a *fieri facias*, and on the 19th December, a levy was made on the personal property of R. & P. W. Webb, consisting of a variety of articles, such as horses, wagons, five thousand bushels of coal, &c.; also, on a tract of sixty acres of land, brick house, forge houses, and on eighty-five and forty-five acres of land, &c. The personal property was sold by the sheriff for $277.41. An inquisition was held, and the real property was condemned. The defendants contend that the recognizance is defective; that by the arrangement made with Mr Lesley the cashier, the plaintiffs undertook to collect the debt from R. & P. W. Webb, with due and proper diligence, and that they have been guilty of *laches* in the collection of the same, to the injury of the defendants, who were the endorsers. On the trial, the defendants offered in evidence the deposition of Morgan J. Lewis, to which the plaintiffs' counsel objected, because the letters of Mr Lesley, the cashier, did not show such an engagement by the bank, to pursue the Webbs, as will charge them with *laches*. They also objected to that part of the deposition which relates to the property in the possession of the defendants in February and March, 1833. As to the first position, in the 7th section of the Act of 21st March 1806, it is provided, that if the defendant is not a freeholder, &c., execution may issue immediately, unless the defendant shall enter surety in the nature of special bail, in which case there shall be stay of execution for thirty days; and if at or before the expiration of that term the defendant shall give security for the amount of debt, interest, and costs, such defendant shall be entitled to the same stay of execution, as if he was a freeholder. The recognizance is taken to the amount of the award in the action, together with the interest that may accrue, and costs. This recognizance is substantially good; for no form of recognizance is prescribed in the Act, and this, as has been proved, is in the prescribed form which has been pursued in the county of Lancaster for a number of years. That it is substantially good, is ruled in *Commonwealth* v. *Finney*, 17 *Serg. & Rawle* 282; where a recognizance very similar in form was held a valid recognizance. Mr Justice Huston truly observes, "that the kind of security is not mentioned in the Act; nor whether it shall be by bond or recognizance, whether on the docket or *in pais;* whether it shall be filed in the prothonotary's office, or kept by the plaintiff. The practice has been in general to enter it on the docket, and for the surety to sign it. It is in some counties drawn more at large, and stated to be for the purpose of obtaining for the defendant the stay of execution allowed by law. In some counties, it is taken in double the amount of the debt; in some, in the amount; and in some, he

becomes security for debt, interest, and costs;" to which we may add the practice, of which this is an instance, to take the security on the docket, under the hand and seal of the surety, acknowledging that he becomes bail for the amount of the award, or judgment (as the case may be), in the action, together with the interest that may accrue, and the costs.

In connexion with this part of the case, we may consider the objection to sufficiency of the bail. At the time the bail was entered, the real estate of the Webbs had not been sold; of this, William Webb, the bail, was entitled to a share, and also to a part of a mortgage, which his uncle, William Webb, held on his father, Jonathan Webb, and which he had willed to him in common with his brothers and sisters. The probability is, therefore, that he would have been able, and would have been justified, had an exception been taken; and that at that time the prothonotary was the judge as to the sufficiency of the bail in the first instance. The most that can be required of an attorney is ordinary diligence and skill; but this would be exacting from him extraordinary care and attention, and particularly as there is nothing to show that William Webb was notoriously insolvent, or that any thing had occurred, of which the attorney was aware, which ought to excite suspicion or induce extraordinary attention and vigilance. We see nothing in the circumstances proved, which imposed any obligation on the plaintiffs or their attorney, to except to the bail.

The deposition of Morgan J. Lewis was said to be objectionable in whole and in part. 1st. Because the letters of Mr Lesley do not show such an engagement by the bank to pursue the Webbs, as will charge them with *laches :* and 2d. That evidence of the value of the property of the Webbs, in the months of February and March 1833, was inadmissible, inasmuch as an execution could not be issued on the award, at any rate, before the 15th April 1833.

The first objection involves the extent of the authority of cashiers of banks. By the protest, the defendants, who were the endorsers, and who received the proceeds of the note, became absolutely bound for the money. But in consideration that the defendants would give them a judgment as a *collateral* security, the cashier agreed that the bank would bring suit against the Webbs immediately, and would endeavour to collect the money from them. The terms, although somewhat varied in the second letter, make no substantial alteration in the contract; for, together, they amount to nothing more nor less than an engagement to pursue the Webbs with reasonable diligence.

By the contract, the situation of the parties is entirely changed. The defendants are converted from absolute to contingent debtors, and the bank made to assume the character of agents, for the collection of the debt from the Webbs; and as such (for a consideration, viz. the confession of judgment by the defendants,)

[Bank of Pennsylvania v. Reed.]

they have obligated themselves to the exercise of ordinary dili-
gence and skill. It is a principle which cannot be controverted,
that the acts of a general agent will bind his principal, so long as
he keeps within the general scope of his authority; but he cannot
bind his principal if he exceed his power. It may, perhaps, be
conceded, that a cashier has a general authority to superintend
the collection of notes under protest, and to make such arrange-
ments as may facilitate that object, by compromise or otherwise;
in short, to do any thing in relation thereto that an attorney might
lawfully do. Nay, more, in particular cases, his authority would
extend further, for the extent of the authority of an agent may
depend sometimes on the nature of the agency, which may be
extended or varied on the ground of implied authority, according
to the pressure of circumstances connected with the business with
which he is intrusted. *Judson* v. *Sturges*, 5 *Day* 556. If it had
been shown that the arrangement in question was necessary for
the security of the debt, or that the circumstances justified the
agent in acting as he did, the principal would have been bound;
but I am not prepared, as a general rule, to say, that the author-
ity of a cashier extends so far as to authorize him to alter the
nature of the debt, or to change the relations of the bank from a
creditor to the agent of its debtor. If this can be done, it is diffi-
cult to set limits to their authority; and, perhaps, many of the
disasters which have lately befallen those institutions have arisen
from the assumption of power by cashiers and presidents. But
however this may be, this case is without difficulty; for it is a
very clear and salutary rule in relation to agencies, that when
the principal, with the knowledge of all the facts, adopts or ac-
quiesces in the acts done under an assumed agency, he cannot be
heard afterwards to impeach them, under the pretence that they
were done without authority, or even contrary to instructions;—
*Omnis ratihabitio mandato æquiparatur.* When the principal is
informed of what has been done, he must dissent, and give notice
of it in a reasonable time; and if he does not, his assent and
ratification will be presumed. So far from the bank disavowing
the act of the cashier, they are now seeking to enforce the con-
tract by the prosecution of a *fieri facias* on the judgment confessed
by the defendants, in pursuance of this very arrangement. There
is nothing then in the first bill.

In the remarks already made, it has been shown that the recog-
nizance was good, and that there was no obligation on the attor-
ney to except to the bail. From this it follows that no execution
could have been issued against the bail until some time in the
month of December of that year. If this be so, it is difficult to
perceive the relevancy of the proof of the value of Webb's goods
in the months of February and March preceding. The Court of
Common Pleas went on the erroneous supposition that execution
could have been issued the 15th April 1833, at the expiration of

[Bank of Pennsylvania v. Reed.]

the twenty days after the award, and that it appeared, from the answer of the witness on his cross-examination, that the Webbs continued their business about the same until he left them, and that they continued to carry on the works through that summer. But it appears that the witness quitted the employment of the Webbs before the 15th April, so that it might be even doubtful whether the court were right in that state of the fact; but as the case stood, the testimony was only calculated to mislead the jury, for there is no pretence to say that the Webbs continued to carry on their business in the same manner, as in February and March, until the month of December, before which time, as has been shown, the defendants could not have issued an execution. This testimony, therefore, was erroneously admitted.

It is also the opinion of the court that the Court of Common Pleas were right in instructing the jury that in order to enable the plaintiffs to recover, it was not necessary to pursue the bail on the recognizance. The contract must receive a reasonable construction; the bank is bound to the exercise of ordinary, not of extraordinary diligence. They have prosecuted the suit against the original partners, and have succeeded in part. If the defendants pay the money (which, we think, they are bound to do,) they may bring a suit on the recognizance, and recover the money from the bank. The original suit was brought in their own name. They have not only the equitable but the legal title; there is, therefore, no obstacle, either legal or equitable, in their way. In conclusion, I must be permitted to express my surprise that a jury could be prevailed on to give a verdict for the defendant, after the clear and explicit charge of the court, and that a new trial, if asked, (which I am disposed to doubt,) was not granted. It is not enough that the want of due and proper diligence should be shown, (which the defendants have failed to do;) but the injury which resulted to the defendants, and the extent of it, should be proved, to justify a verdict for the defendants.

Judgment reversed, and a *venire de novo* awarded.