L. W. HILL et al., Appellants, v. BANK OF SENECA, Respondent.

St. Louis Court of Appeals, March 4, 1901.

1. **Bank**: ELEMENTS OF A BINDING CONTRACT ON: CASHIER'S POWERS. Any contract is binding on a bank, made by its cashier acting within the reasonable or apparent scope of his authority, or made by him, when acting with the knowledge and approval of the directors, or like others which he had been accustomed to make with their approval, or that was afterwards ratified by the bank's availing itself of the benefits of such contract.

2. ———: ———. Divergent as are the decisions concerning the functions of a cashier, they all agree that he should have the custody

of the notes and securities of the bank, and take all the steps necessary to realize on them sanctioned by custom and law.

3. ———: ———: ———: POWERS IMPLIED. The performance of a duty by a cashier, or any agent, involves the power to employ the required means to accomplish it, qualified to the extent that only such power will be used to subserve the end in view within the bounds of right and reason.

4. ———: ———: ———: AGENTS WITH GENERAL POWERS. Where an agent is clothed with general powers, the means and measures necessary to effectuate the powers granted. attend the grant of authority as inevitable incidents.

5. ———: ———: ———. Since a cashier is empowered to enter into contracts for his bank in the course of collecting its notes which entail expense, he can certainly make an agreement for that purpose that will entail no expense, as was done by the cashier in this case.

6. ———: ———: ———: IMPLIED AUTHORITY, AFFECTED BY CIRCUMSTANCES. The authority of an agent may be extended or varied on the ground of implied authority according to the pressure of circumstances connected with the business with which he is intrusted, if shown that his action in question was necessary for the security of the debt, or that the circumstances justified him in acting as he did.

7. ———: MORTGAGEE MAY INCUR EXPENSES, WHEN. Apart from any agreement made with the mortgagor, a mortgagee of personal property, on taking possession, may incur expense in preserving or selling the property and deduct it from the proceeds realized.

8. ———: CASHIER'S CONTRACT: WHETHER FOR BANK'S INTEREST, QUESTION FOR JURY. It should have been left to the jury to say whether, considering all the circumstances, it was necessary in order to properly protect the bank's interest for its cashier to contract for the threshing of the wheat; if so, the bank would be liable to plaintiffs for the unpaid balance of the compensation for their work.

9. ———: ———: DIRECTOR'S KNOWLEDGE. It was not necessary for them to take official action as a board in order to ratify his contract, for if they had knowledge that the cashier made the agreement with plaintiffs, and made no protest and gave plaintiffs no notice, then the bank must be held to have adopted the cashier's act.

Hill v. Bank of Seneca.

Appeal from Newton Circuit Court.—*Hon. Henry Clay Pepper*, Judge.

REVERSED AND REMANDED.

### STATEMENT OF THE CASE.

On the second day of July, 1898, the respondent was the holder of two chattel mortgages executed by one W. A. Richardson on thirty-nine hundred acres of growing wheat near Catoosa in the Indian Territory. These mortgages were given earlier in the same year to secure two promissory notes amounting to $4,500, one of which matured May 16 and the other July 19 of said year. The latter was for $3,000.

J. M. Berry was the respondent's cashier. On the second day of July he went to Catoosa to look after the condition of the indebtedness owing to the bank, on account of some information which had made him uneasy. He testified that Mr. McGannon, the bank's president, knew he had gone, but did not know what he was going to do, nor did he himself, when he left know what he would do; that he simply went to look after the debt and did not know whether it would be necessary to collect or not until he got to Catoosa. On his arrival he found the wheat had been cut and shocked and was then being threshed by the plaintiffs, a firm engaged in threshing wheat under the style of Hill Brothers. Richardson had made a contract with them to thresh this wheat at the price of seven cents per bushel and about six or seven thousand bushels had been already cleaned when Berry arrived. One of the plaintiffs, at his request, pointed out the mortgagor to him. The result of Berry's interview with Richardson was that the latter delivered possession of the entire crop of wheat to him as the representative of the bank, under the mortgages. The mode of delivery

was by writings on the backs of the mortgages, one of which is as follows: "Possession of the within described property is hereby given in full to the Bank of Seneca, Missouri, through its cashier, J. M. Berry, who through himself or representative, is to attend to the further threshing of the wheat, loading and billing the same, and is to receive full proceeds of sale of wheat, until all the indebtedness due said bank is paid in full and all the expenses of threshing, hauling, loading, freight, commission, labor and other charges are paid." The other memorandum of delivery does not materially differ from the foregoing. Both were witnessed by O. W. Hill, one of the plaintiffs, at the request of Berry.

A firm by the name of T. M. Reynolds & Co. was doing business in Catoosa at that time. Its members were T. M. Reynolds and Thomas Dougherty. The day after the wheat was turned over to Berry, he put it in charge of the plaintiffs temporarily until he could send a man to take care of it. He drove out the following day to the field in company with Reynolds and Dougherty and told O. W. Hill, one of the plaintiffs, that he then turned the wheat over to those two men. It was on that day that the contract which is the basis of the present action, is claimed to have been made. O. W. Hill swears that Berry told him, they (the plaintiffs) should "go ahead threshing just according to the old contract and he would pay every dollar of it." L. W. Hill said that at the time, namely, July 3, "they came back, Mr. Berry, Mr. Reynolds and Mr. Dougherty and called my brother, O. W. Hill, and he motioned for me to come. I went out to the buggy where they was and Mr. Berry says, 'This wheat I put in your hands yesterday I will take out and put in Mr. Dougherty's hands.' He said 'Go ahead with the threshing and look to the Bank of Seneca for the pay, for we will pay you for the entire crop.'" Berry

had previously told O. W. Hill the bank had mortgages on the crop and that he was the cashier. Plaintiffs continued to thresh, the wheat was shipped by T. M. Reynolds & Co., who paid various sums to the plaintiffs for the crop, aggregating $1,062. No dispute occurred until the eighteenth day of July, when a check, drawn by the plaintiffs, in the usual way, was dishonored by Reynolds & Co. One of the plaintiffs went to Catoosa to see about it, when Dougherty said Wittick was to pay the bill.

It faintly appears from the record that a bank in Coffeyville, Kansas, of which this man Wittick was cashier, had a claim; he had come upon the scene and some arrangement was made between him and the defendant by which the Coffeyville Bank was to receive the wheat, or the proceeds of it, on the indebtedness of Richardson to it after the defendants' notes were discharged. Whatever arrangement there was between the respondent and Wittick, the plaintiffs were not parties to it. It seems, however, that Wittick was in Catoosa on the ninth day of August, when a controversy arose between him and Dougherty in the presence of O. W. Hill as to who should pay the threshing charges. Each claimed the other should do so. Whereupon, Hill said as neither would stand good for the pay he would quit threshing. Wittick then said: "I will give you a contract for what wheat I got at seven cents a bushel." The plaintiff threshed three thousand bushels after that day and kept two carloads of it to sell and thereby realize compensation for their work. They were induced to part with this wheat by Reynolds & Dougherty promising them if they would let it go it should be shipped to the Bank of Seneca which would pay the bill. Several other statements made by Reynolds & Dougherty appear in the evidence, the general tenor of which is that the respondent had agreed to pay for the threshing and would have to do so.

Berry testified that when he returned to Seneca the president of the bank was informed he had taken possession of the wheat crop and put it in the hands of T. M. Reynolds & Co.; also that he had informed the president what he had done. Berry made another trip or two to Catoosa subsequent to the first one.

The bank received a considerable sum on its indebtedness before July 15, on which day Berry was in Catoosa and got a draft for the balance that was owing. Berry swore he was advised that a report had been made to the bank showing the amount paid to Hill Brothers for their work. He likewise said the mortgages were brought back, he believed, and kept in the bank, where the president might have seen the memoranda of delivery.

It is claimed by the respondent that the plaintiffs were notified on July 15 that it had been paid in full and would not be responsible for any further charges for threshing but we have failed to discover any evidence whatever to that effect in the record, except what is contained in Berry's deposition. This deposition was excluded by the court on the respondent's objection. It is before us only for the purpose of ascertaining whether the court erred in so doing and is, therefore, not evidence tending to prove such notice was given to the plaintiffs.

The record does not show who were the directors of the bank, nor how many there were. Monthly meetings were supposed to be held, but sometimes were omitted for several months. There is no positive testimony that the board had knowledge of the arrangement made by Berry in regard to the wheat, but it is in evidence that the president knew it. Berry said, in answer to a question, that he did not know whether the directors knew "officially" that the notes had been paid.

It is impossible to ascertain with certainty from the record just how much wheat the respondent received, what became of

what was left after it had been paid, or how far the wheat which had been already threshed, when it took possession, went towards the discharge of its claims.

At the conclusion of the evidence the jury returned a verdict for the respondent by the direction of the court. The principal question, therefore, for consideration is, whether there was evidence tending to show the defendant was liable, sufficient to go to the jury?

*John T. Sturgis* for appellant.

(1) A party can not claim the benefits of an agent's acts and disclaim the burdens imposed thereby. One who avails himself of the advantages arising from the act of another in his behalf must assume the responsibilities flowing from such act. He can not accept the fruits of the agent's contract and then deny his authority to bind him. Dry Goods Co. v. Bank, 81 Mo. App. 46; Ten Broek v. Boiler Co., 20 Mo. App. 19; McLachlin v. Barker, 64 Mo. App. 511. (2) The cashier, as chief executive officer of the bank, had authority to make the contract. Bank v. Wall Paper Co., 77 Fed. Rep. 85; Bank v. Howell, 79 Mo. App. 321; Boothe v. Loy, 3 Mo. App. Rep. 667-668; Zane Banks and Banking, sec. 100; 2 Cook Stock and Stockholders, sec. 718; Landin v. Bank, 74 Minn. 222, 77 N. W. 35; Bank v. Kilgore, 10 Cal. App. 534, 54 Pac. 1023. (3) The cashier, having authority to collect the note secured by mortgage on the wheat, had authority to take the wheat for the bank and would have the implied authority to take necessary steps to preserve and realize on the property taken. "An authority given to an agent carries with it the power necessary or fairly adopted to carrying out the authority." Zane on Banks and Banking, sec. 101; Burrell v. Bank, 2 Met. 163; State ex rel. v. Gates, 67 Mo. 143; 1 Am. and Eng. Ency. of Law (2 Ed.), p. 988; Smith's Charities v. Connelly, 157 Mass.

272, 31 N. E. 1058. (4) Where an unauthorized act of an agent of a corporation is clearly beneficial to the corporation, a presumption ·of ratification will arise from slight circumstances. 2 Morowitz Private Corporations, sec. 629; Bank v. Bank, 107 Mo. 133-145.

*J. H. Keith* for appellant.

(1) "The mortgagee, to say the least, had knowledge that these people were threshing the wheat, and being a necessary act before it could be converted into cash, his mortgage became subject to the lien of the parties doing the threshing." 1 Cobbey on Chattel Mortgages, sec. 460; Scott v. Delahun, 65 N. Y. 128; Hammond v. Danielson, 126 Mass. 294; Watts v. Sweeney, 127 Ind. 116, 26 N. E. 680; Case v. Allen, 21 Kan. 217. (2) "The cashier of a bank is its executive officer, by whom its debts are received and paid, and its securities taken and transferred. He conducts the whole financial operation of the bank." 5 Am. and Eng. Ency. of Law (2 Ed.), p. 76.

*George Herbert* for respondent.

(1) "The cashier is the general executive officer of the bank. * *. * He is not the agent of the board of directors, but of the bank itself. * * * But a large number of acts have been held to be not within the scope of his general authority. * * * He can not compromise or settle the claim of the bank, or release its claims, unless authorized so to do by the rules and usages of the business. * * * He has no power to make purchases for the bank not in the line of acquiring bankable securities. * * * He has no power to assign the bank's property unless it be in the usual course of business." Zane on Bkg., sec. 100. (2) "The

authority of a cashier is a limited authority, and his acts are only binding upon the bank when he acts within the sphere of his agency. His ordinary duties do not comprehend the making of a contract involving the payment of money, without an express authority from the directors, unless it be such as relates to the usual and customary transactions of the bank.  *  *  *  And, generally speaking, the bank will not be responsible for acts done by the cashier which are discretionary, semiofficial, and solely within the prerogative of the directors, although he performed them in good faith and under color of authority. Boon on Banks, citing, amongst others: Foster v. Bank, where the cashier fraudulently abstracted from the bank a special deposit of gold (9 Am. Dec. 168); U. S. v. City Bank, where the cashier certified the authority of another to contract for the bank in undertaking to transfer funds from place to place (21 How., 62 U. S. 356); Bank of U. S. v. Dunn, where both the cashier and president, without order of board, agreed to qualify the ordinary liability of an indorser of paper they discounted for the bank (6 Peters, 31 U. S. 59); Lionberger v. Mayer, holding that a cashier has no implied powers of purchase for his bank (12 Mo. App. 575); Daviess Sav. Ass'n v. Sailor, where the cashier assumed to discharge a surety without payment of his debt and lulled him to sleep on his remedy as surety (63 Mo. 24); and Winsor v. Lafayette Bank, where cases above cited and the broad principles we contend for are considered and approved (18 App. 665); citing: Shyrock v. Bashore, 82 Pa. St. 159. (3) "As soon as a mortgagee has sold enough of the mortgaged property to pay the amount due him, with necessary expenses of the sale, his title to the mortgaged chattels remaining unsold is extinguished; and if he proceed further to sell, or otherwise exercise control over them, he is a trespasser." 2 Cobby Chat. Mortg., sec. 987. (4) On satisfaction of the bank's notes, the legal title to the remain-.

der of the wheat instantly reverted to Richardson or his assigns. McMillan v. Grayston,' 83 Mo. App. 426. (5) "As to the surplus over and above the amount of his mortgage claim, he (the mortgagee) must account to the mortgagor, for whom he holds it in trust. The mortgagor may compel an accounting of the trust by a bill in equity or he may bring an action at law for such surplus." This is the case where sale has been in pursuance of the mortgage power. 2 Cobby Chat. Mort., sec. 985, and cas. cit.

GOODE, J.—The theory on which the peremptory instruction is defended and the one doubtless on which the court gave it, is, that the contract made by the cashier with the appellants did not appear from the evidence adduced to be binding on the bank. The contract might be obligatory for several reasons: either because it was within the apparent scope of the cashier's authority, because there was testimony from which it was fairly inferable that he was acting with the knowledge and approval of the directors in making the arrangement, because it was an act such as he was accustomed to do with their approval or because, after acquiring knowledge of what he had done, they ratified it by not objecting but retaining the advantages which accrued to the bank.

The principles of law concerning the powers of bank cashiers, as of other officers of private corporations to bind their companies are well known, but their application in cases against banking companies has been so contradictory and inharmonious that but little more than schedules of permissible and forbidden acts of such officials are furnished. The trite precept that a cashier's conduct and agreements bind the corporation "when they fall within the actual or apparent scope of his authority," or "in the sphere of his duty," is often a perplexing landmark to guide us to a satisfactory decision, so ob-

scured is it by the widely different opinions announced by the courts as to what words or deeds it embraces—opinions often influenced by what happened to be deemed a safe public policy. Deriving such assistance as may be from those judgments which seem the more authoritative or better reasoned, we will endeavor to ascertain whether or not the contract in question was the respondent's or whether there was evidence tending to show it was which the jury should have weighed, bearing in mind the particular circumstances of the case and assuming that the president of the bank knew of and made no objection to what the cashier had done.    The latter's testimony justifies this conclusion.

Divergent as the precedents are concerning the functions of a cashier, they all agree that one of them is the custody of the notes and securities of the bank and the collection of its paper.    As the executive officer and administrative head of the institution, it is peculiarly his province to take care that its bills receivable do not become stale nor its securities impaired by inattention.    Seeing that notes are attended to when they mature, either by payment or renewal, or, in default thereof, taking the proper steps to realize on them, are sanctioned both by custom and law as a principal part of his duty.    Young v. Hudson, 99 Mo. 102; Western Bank v. Gilstrap, 45 Mo. 418; Eastman v. Coos Bank, 1 N. H. 23; Bridenbecker v. Lowell, 32 Barb. 9; Corser v. Paul, 41 N. H. 24, 77 Am. Dec. 753; United States v. City Bank, 21 How. (U. S.) 356.    The power to collect implies, of course, doing whatever is personally necessary to success and the exercise of some discretion in determining what is necessary under given circumstances. The performance of a duty by any officer, agent or person, involves, in the nature of things, the power to employ means to accomplish it, and the further power to decide what means to employ.    The qualification is, that these implied secondary

powers must be such as will probably subserve the end in view, must lie within the bounds of right and reason. Extravagant, unlawful acts will not be upheld because wrong in themselves and also because they suggest their own impropriety to the party seeking to make them available against the principal. But for what is warranted by general usage, or by the special usage of the party to be charged, or is manifestly necessary to the attainment of the desired object, the principal will be responsible unless the agent's freedom was restricted by known instructions. Mabray v. Kelly-Goodfellow Shoe Co., 73 Mo. App. 1; Watkins v. Edgar, 77 Mo. App. 148; Clark v. Southern Electric Supply Co., 72 Mo. App. 506; Keller v. Myer, 74 Mo. App. 318; Hill v. Wertheimer-Swarts Shoe Co., 150 Mo. 483; Breckenridge v. Ins. Co., 87 Mo. 62; Samuel v. Bartee, 53 Mo. App. 587; State ex rel. v. Gates, 67 Mo. 139; Sparks v. Despatch Transfer Co., 104 Mo. 531.

"If there is one principle in the law which finds abundant and oft-repeated recognition, it is this: that where an agent is clothed with general powers, the means and measures necessary to effectuate the powers granted, attend the grant of authority as inevitable incidents." State ex rel. v. Gates, supra; Edwards v. Thomas, 66 Mo. 468; Barnes v. City of Hannibal, 71 Mo. 449.

In the present case, when Berry took the wheat, the larger note for $3,000 was not due. It was, as stated, secured by a separate mortgage on different fields from those covered by the mortgage whose condition was then broken. The grain was in process of threshing pursuant to a contract which Richardson had made with the plaintiffs; six or seven thousand bushels had been separated, for which work Richardson owed them. Berry said he received notice the matter needed attention and went down, that he was eighty miles from home, could not leave the property in the owner's hands and had to be represented by

some one; so he appointed the firm at Catoosa.   This all tends to show he was confronted with an emergency and took what measures seemed best for the bank's interest.   It may be that Richardson would not have surrendered the mortgaged property on other terms than Berry made.   In good conscience he should have protected the plaintiffs if possible, for he had hired them to bring their machines and hands to his fields to clean the crop. The larger part of the property could not then have been recovered by action, for no breach of the conditions of the mortgage had occurred.   Both instruments contained the usual provisions about possession remaining with the grantor until breach, and for a public sale after default.   The bank eluded the hindrance and inconvenience of those clauses by the terms of the delivery obtained by Berry, secured immediate possession and the privilege of a private sale without defraying the expense of threshing, shipping, freight, commission, labor or other charges; certainly an advantageous arrangement.

We do not see how it can be denounced as outside the apparent or actual scope of his authority, in view of the usage and duty of bank cashiers to make collections or his own usage as testified to by himself to attend to such business for the respondent.   It looks like the contract made with the plaintiffs was one step towards the carrying out of the understanding with Richardson, under which he surrendered possession.   Perhaps it was necessary to get the wheat out of shock to preserve it. There was testimony that the weather threatened rain.   We would not hold a gratuitous and uncalled-for contract by Berry, to thresh the entire crop, binding on the bank.   No such power belongs to a cashier's ordinary duties.   To have that effect it must have been apparently necessary to the proper protection of the bank's interest either by enabling it to make good its lien or preserve the property.   Just why Berry was summoned to Catoosa is not shown, but for some cause he was alarmed.   If

Richardson had turned over the crop without conditions· or terms and no injury was threatened, but the bank could as well have realized by selling it in the shock, a contract which imposed a useless and heavy charge for threshing would be very questionable. But the facts here are quite dissimilar and would legitimately warrant another conclusion as to the propriety of the cashier's act and consequently as to his authority to act. We can not lose sight of the important, if not controlling, fact that Berry incurred no expense for the bank to bear by his contract with the plaintiffs. The memorandum of delivery afforded ample protection against any charge, by authorizing him or his representative to attend to the further threshing of the wheat, loading and billing the same, and to receive full proceeds of sale of wheat until all the indebtedness due the bank was paid in full and all the expenses of threshing, hauling, loading, freight, commission, labor and other charges paid. The bank was safeguarded by sweeping and comprehensive provisions in its behalf.

A cashier is empowered to enter into some contracts for his bank in the course of collecting its notes which entail expense. He may institute suits and employ counsel. Western Bank v. Gilstrap, 45 Mo. supra; Young v. Hudson, 99 Mo., supra; Southgate v. Railway Co., 61 Mo. 89; Root v. Olcutt, 42 Hun. 538; Eastman v. Coos, 1 N. H. 23; Bank v. Keavey, 128 Mass. 298; Frost v. Sewing Machine Co., 133 Mass. 563. It is difficult to see why he may not make an agreement which will entail no expense. It is true the plaintiffs are strangers to the memoranda for delivery of possession and are not suing on them, but they knew their contents, for one of them, O. W. Hill, was the attesting witness, and might well assume without further investigation that Berry, as cashier in charge of the bank's security, which he was then enforcing, was authorized

to comply with the provisions of the memoranda since it could be done cost free.

Various acts done by cashiers to facilitate collection of their bank's securities more onerous than the one in this case, have been countenanced when the circumstances demanded them. Fleckner v. Bank of United States, 8 Wheat. 338; Bridenbecker v. Lowell, 32 Barb. 9; Bank v. Reed, 1 Watts & S. 101; Savings Bank v. Keavey, 128 Mass. 298; Badger v. Bank of Cumberland, 26 Maine, 428; Corser v. Paul, 41 N. H. 24. In Bank v. Reed, supra, it is said the authority of an agent "may be extended or varied on the ground of implied authority according to the pressure of circumstances connected with the business with which he is entrusted. If it had been shown that the arrangement in question was necessary for the security of the debt or that the circumstances justified the agent in acting as he did, the principal would have been bound."

It is claimed by the respondent that it was only liable for the threshing of the wheat which was used to satisfy the notes it held against Richardson. Apart from any agreement made with the mortgagor, a mortgagee of personal property, on taking possession, may incur expense in preserving or selling the property and deduct it from the proceeds realized. Friendly v. McCullough, 9 Or. 109; Caldwell v. Hall, 49 Ark. 508; Hughes v. Johnson, 38 Ark. 296; Fry v. Ford, 38 Ark. 255; Schiffer v. Feagin, 51 Ala. 335. The bank might, therefore, independently of any authority, have threshed the wheat required to discharge its claims as a part of the expense of foreclosure if such action was necessary to enable it to save the grain or sell it. But it was specially empowered to pay for cleaning the entire crop, took possession on that condition and employed the plaintiffs to perform it, as the record now stands. Why the agreement as to possession was not fully carried out

does not clearly appear, but probably because an understanding was had with the Coffeyville Bank that it should take the part of the crop left after the defendant was satisfied and see to the threshing. But if Berry had the right to make the agreement with plaintiffs in the first place, they could not be prejudiced by such subsequent arrangement to which they did not accede.

We rule, then, that it should have been left to the jury to say whether, considering all the circumstances, it was necessary in order to properly protect the bank's interest for its cashier to contract for the threshing of the wheat; if so, the bank is liable to plaintiffs for the unpaid balance of the compensation for their work.

We also hold, there was evidence for the jury on the question of the ratification of the contract by the directors. We assent to the proposition of law contended for by the respondent that the bank did not necessarily ratify everything done by Berry in connection with the wheat, by merely retaining and selling it to pay its claims. The mortgages gave it the right to realize what was owing, out of the property covered by them. This was a right separable and distinct from the contract made with the plaintiffs. But if the directors became apprised of their contract for the threshing, and afterwards allowed them to continue the work, the bank is bound to pay for it in full. If the directors intended to repudiate the contract, it was their plain duty to notify the plaintiffs to that effect and have them discontinue. The only notice to the plaintiffs was the refusal to honor their check on the eighteenth day of July. After that date, it seems, they were induced to go on by the representations of Reynolds & Dougherty whom the bank had put in charge of the wheat and all matters connected with its threshing and shipping. McGannon, the president, knew of this arrangement. Berry swore that he was advised reports were

made to the bank of the sums paid plaintiffs for their work. He said, also, that he took the mortgages back and, according to his impression, they were kept in the bank with the delivery agreements on them.    Without going so far as to say, as was said by the court in Dry Goods Co. v. Bank, 81 Mo. 46, that it is "hardly comprehensible" how this transaction could have gone on without the knowledge of the directors, we think there was evidence from which the jury might reasonably have inferred that they were cognizant of the cashier's doings.    It was not necessary for them to take official action as a board in order to ratify his contract.    If they had knowledge that he had made the agreement with the plaintiffs and made no protest and gave no notice to the plaintiffs, the bank must be held to have adopted its cashier's act.

The judgment is, therefore, reversed and the cause remanded.    All concur.