[No. 8196-8197.]

## DREGMAN v. MORGAN COUNTY NATIONAL BANK, ET AL.

## STEMEN ET AL v. MORGAN COUNTY NATIONAL BANK ET AL.

1. CONTRACTS—*Construed.* A contract between an irrigation district and Dregman provided that $204,000, face value, of the bonds of the district should be deposited with a bank named, as trustee, for securing the performance of a contract between Dregman and the district, for the construction of certain works for irrigation; that Dregman should be regarded as the owner of the bonds; and "have the exclusive right" to sell and dispose thereof. Another contract between the district and Dregman and others, of even date with the former, provided that $2100.00, face value, of the same issue of bonds of the district should be deposited with the same bank "as trustee for the sale thereof, to be by it pooled with all other bonds of the district * * * all of said bonds to be sold upon the same terms and conditions and for the same price, etc." *Held,* that the two contracts must be construed together, and that notwithstanding the reference to the bank, in the latter, as "trustee for the sale," the authority to sell and dispose of the bonds, as well the $2100.00 as the $204,000, was vested exclusively in Dregman.

2. ——*Construction by Conduct of Parties.* The construction placed by the parties upon the contract, by their conduct, is to be accepted, in the interpretation thereof after controversy arises.

3. ——*Parties.* An option to purchase certain bonds of an irrigation district was granted to the cashier of a bank, not naming the bank. *Held,* that though the bonds were then on deposit with the bank,

as trustee, it was the cashier, individually, and not the bank, that received the option.

4. INTEREST—*Liability for*—*Trust Funds*. Cetain bonds of an irrigation district were deposited with a bank, as trustee, to secure performance of a contract for the construction of the works of the district. The contract authorizing the deposit, and setting forth its purpose and terms, provided that the proceeds of the sale of the bonds should be held by the bank, and disbursed according to particulars set down, and no part should be otherwise disbursed, until full completion of the contract for construction of the works. The bank was not liable for interest upon the fund arising from the sale of the bonds, while held by it, pursuant to the terms of the deposit.

That the bank permitted its cashier to appropriate such interest to his own use was held not to affect the question.

5. ESTOPPEL—*By Conduct*. The bonds of an irrigation district belonging to Dregman had been deposited with the Morgan County Bank, to be sold by Dregman, and the proceeds to be deposited with, and disbursed by the bank, according to the terms of the agreement constituting the trust; after the completion of a certain contract between Dregman and the district, the funds remaining in the hands of the bank to be paid to Dregman. Dregman sued the bank for moneys received by it, under this contract, and not accounted for. The bonds had been sold by Roediger, cashier of the bank, to one Clark, and Clark afterwards brought his action against the bank, Roediger and another, for fraudulent representations made to him, inducing the purchase of the bonds. In the suit of Dregman against the bank and others the defendants pleaded the suit of Clark, and recovery therein by the plaintiff, alleging that Dregman assisted Clark in his action, gave testimony therein in his favor, and that Clark's recovery was attributable to false statements made by Dregman to Roediger, and by Roediger innocently repeated to Clark, and that Dregman was therefore estopped. In view of the fact that Dregman was not a party to the suit of Clark, had no opportunity to deny responsibility for the misrepresentations of which Clark complained, that his testimony in that action had no relevancy to these representations, that no claim was made that he did not testify truthfully as to the matters to which he was examined, and that the bank's settlement with Clark alleged in the answer, was made without his knowledge, the defense of estoppel was rejected.

*Held*, further, that the production by Dregman, in the action of Clark, of letters and telegrams between himself and Roediger, was not a wrong which should work an estoppel upon Dregman to maintain his action.

6. DECEIT—*Fraudulent Concealment*. A contract induced by the fraudulent concealment of material facts will be vacated on complaint of the injured party.

7. Bank—*Liability for Misconduct of. Officers.* The Morgan County Bank held certain bonds, the property of Dregman, as trustee to secure Dregman's performance of a certain contract.' Dregman was entitled to control the sale of the bonds, and by the contract under which they were deposited it was provided that upon the completion of Dregman's contract, the funds "in the hands of the trustee or bonds remaining, etc." should be delivered to Dregman. The cashier of the bank by fraudulent misrepresentations acquired from Dregman a contract of partnership entitling him to one-half of what should accrue to Dregman under the contract in which the bonds were obtained, and the bank permitted the cashier to appropriate the moiety of the fund to which, otherwise, Dregman was entitled. *Held,* that the acts of the officers of the bank in relation to these trust funds were the acts of the bank itself, and it was responsible to Dregman for what the cashier had wrongfully appropriated, as the fruits of his fraud, with interest thereon from the date of the contract of partnership, so fraudulently procured.

*Error to Morgan District Court.*   Hon. H. P. Burke, Judge.

Mr. Willis M. Brooks, Messrs. Van Bradt & Van Bradt, Messrs. Melville, Sackett & Calvert, and Max Melville, for plaintiffs in error.

Messrs. Vaile, McAllister & Vaile, for defendants in error.

Mr. Justice White delivered the opinion of the court.

W. A. Dregman, as plaintiff in Case No. 8196, and W. E. Stemen and A. K. Clarke, as plaintiffs in Case No. 8197, instituted their respective suits in the District Court against The Morgan County National Bank of Fort Morgan, M. L. More and J. H. Roediger. The two cases were consolidated and, upon trial, judgments were entered in favor of the defendants, and the defeated parties have brought their respective cases here for review on error. We will dispose of the matters involved in one opinion.

The suits are in equity. They had their inception in the sale of certain bonds of the Badger Creek Irrigation

District, and in the construction of reservoirs and ditches constituting the irrigation system of said district. In the Dregman case the complaint contains two causes of action. The first sought to set aside certain options, releases, and receipts, in relation to the sale of $204,000 face value of said bonds, and to recover a designated sum alleged to have been received by defendants in the sale thereof, in excess of the sum accounted for to plaintiff, together with accrued interest on said bonds, and certain interest received on the proceeds of the sale thereof from the Commercial National Bank of Chicago. The second cause of action was to set aside a written partnership agreement entered into between Dregman and Roediger for the construction of the irrigation system, together with certain settlements relating thereto, and to recover $16,206.42 profits received by Roediger from Dregman in the settlement of the partnership, together with thirteen certain water rights. The purpose of the Stemen-Clarke suit was to set aside certain releases and agreements of settlement, and to recover a designated sum as the proportion belonging to plaintiffs, arising from the sale of $21,000, in face value, of certain bonds of the irrigation district, received by the defendants upon the sale thereof, in excess of the sum for which they accounted to plaintiffs, together with certain accrued interest upon said bonds and upon the proceeds thereof. The theory of the complaints is a conspiracy, and fraudulent acts of the defendants in the sale of said bonds, and in the construction of the irrigation system. The joint answer of the defendants, More and the Bank, in both cases was, in substance, a denial of all the charges of fraud and conspiracy, and of their participation in any of the matters upon which the alleged causes of action were based. The answer of defendant Roediger denied all material charges of the complaint, except the date of

the partnership agreement, corroborated the answer of More and the Bank to the effect that they had nothing to do with the transactions, and alleged that the bonds in question were sold by the plaintiffs to him, personally, for seventy-five cents on the dollar, and that he accounted to them for all of these proceeds, and denied all charges of improper conduct in relation to the partnership contract between himself and Dregman. Defendants also alleged that the settlements and releases sought to be set aside were had and given with the full knowledge of all the facts by the respective parties thereto, and in full settlement of such transactions, and that plaintiff Dregman is estopped and precluded from prosecuting his causes of action, by virtue of his certain acts in relation to a suit for damages for fraud and deceit in the sale of these bonds, prosecuted in the Federal Court in the State of Colorado, by Bert Clarke against the defendants herein. Other material facts are as follows:

The Morgan County National Bank is a national banking institution of which defendant More was its president, and defendant J. H. Roediger its cashier. More, since the institution of the suits, died, and Susie M. Roediger, as his administratrix, has become a party defendant in his stead. The plaintiffs were the owners of the greater portion of the outstanding stock of the Badger Creek Reservoir Company, a Colorado corporation, organized for the purpose of acquiring certain water rights on Badger Creek, a natural stream in Morgan County, and for constructing an irrigating system for watering certain lands lying contiguous to such stream. In the spring of 1909 the lands were organized into an irrigation district, Dregman actively participating in the organization. Thereupon a bond issue upon the district of $250,000 was voted for purchasing water rights, and constructing the irrigation system. At the

same time two contracts were ratified.  One of such contracts was entered into between the Irrigation District and the Badger Creek Reservoir Company, whereby the district purchased of the company approximately three-fourths of its water rights, together with a proportionate share of its capital stock, for the express consideration that the Irrigation District would construct the irrigation system as planned.  The other contract was between the Irrigation District and Dregman, whereby, in consideration of $204,000 of the bonds of the district, at par, the latter agreed to construct the irrigation system, and pay the first three semi-annual interest coupons upon the bond issue.  Upon the same day these contracts were executed the Irrigation District entered into a contract with Dregman, Stemen and A. K. and H. L. Clarke, whereby, in consideration of $21,000 in bonds of the Irrigation District, (less $100 in bonds, the proceeds of the sale of which were to be returned to the district), it purchased of them approximately one-eighth of the water rights and capital stock of the Badger Creek Reservoir Company, which they owned individually.  The construction contract also required Dregman to furnish the district a bond in the sum of $20,000 for the carrying out of his contract, and to begin work upon the successful termination of court proceedings establishing the district and confirming the bonds.

In the aforesaid construction contract Dregman is referred to as the "contractor" and the Irrigation District as the "District."  This contract, *inter alia,* contained the following provisions, to-wit:

"It is further understood and agreed that for the convenience of both parties hereto that the said bonds of the said district hereinabove mentioned shall hereafter, and when the said bonds shall have been voted and confirmed by a decree of the District Court pursuant to

law, be placed in trust in the hands of the Morgan County National bank as collateral security for the said twenty thousand dollars personal bonds hereinbefore mentioned, the said district bonds to be held in trust by the said Morgan County National bank, and to provide for the sale of said two hundred four thousand dollars of the bonds of said district, and to make provision for the application of the proceeds thereof in such a manner as to not only give greater security to the district in the performance of this construction contract but also to provide adequate means for the speedy payment of estimates and completion of the said works, reservoir and ditches of the said district.

And for the purpose of effectuating the execution thereof, it is further mutually agreed by and between the parties hereto and for and in consideration of the better fulfillment and complete performance of the covenants and agreements in this construction contract contained, as well as the mutual benefits therefrom to be derived, and the final and total payment to the contractor of bonds for the par value of two hundred four thousand dollars ($204,000.00), as hereinbefore provided, it is agreed that the two hundred four thousand dollars ($204,000.00), of the bonds of the district, when confirmed as aforesaid by the District Court of Morgan County, shall at once thereafter be placed in the said The Morgan County National Bank of Fort Morgan, Colorado, in trust, the said bonds, or the proceeds derived from the sale thereof, as the case may be, to be by said trustee held, disposed of and disbursed for the following uses and purposes, and in the following manner and upon the following terms, to-wit:

That the contractor from and after the delivery of the said bonds to the trustee shall be deemed to be the owner thereof and shall have the exclusive right to at

any time after the confirmation of said bonds, as aforesaid, sell and dispose of said bonds, or any portion thereof, and upon such sale at not less than seventy per cent net of the face or par value (exclusive of interest payments) the trustee shall deliver said bonds or such portions thereof to the purchaser or purchasers of the same upon the payment to it of the amount or amounts for which said bonds are sold. Such proceeds of said bonds to remain in the hands of said trustee and be by it disbursed, as follows: Any and all sums paid to said trustee by the contractor (or the purchaser of said bonds) for the purpose of paying interest coupons numbered 1, 2 and 3 shall be held by said trustee as a separate or 'interest fund' and by it disbursed only in the payment of interest coupons numbered 1, 2 and 3 upon the delivery thereof by the legal holder of the same.

All the remainder of the proceeds of said bonds paid to said trustee shall be disbursed and paid out to the contractor from time to time in payment for labor, materials, engineering services and other and incidental expenses upon monthly estimates as in this construction contract and hereinafter provided for; no part thereof to be otherwise disbursed until the full completion of the terms of the construction contract, at which time the remainder of such funds in the hands of the trustee or in bonds remaining in the hands of the trustee and unused shall be paid over and delivered to the contractor or his order, but only upon the written order therefor executed by the Board of Directors of the district as more fully hereinafter expressed. * * *

It is further agreed that all charges, if any, by the trustee herein named for any services by it rendered, shall be borne by the contractor, and that when this contract shall be executed and delivered to the trustee along with the bonds herein specified, the contractor shall be

deemed to have waived the right to withdraw the proceeds to be derived from the sale of these bonds until the full completion of this construction contract, thereby giving greater security to the district.

"It is understood and agreed that the trustee, The Morgan County National Bank, shall be guided by this construction contract in the discharge of its duties; that a copy of this contract shall be deposited with said trustee; that both parties hereto have the privilege of examination thereof at any time, the said copy so furnished to the said trustee to be returned to the secretary of the district when this contract is complete."

The Dregman-Stemen-Clarke contract referred to the aforesaid construction contract and contained, *inter alia*, the following provisions relative to the delivery and sale of the $21,000 in bonds, to-wit:

"It is hereby agreed by and between the respective parties hereto that the said bonds when ready for delivery shall be delivered to the Morgan County National Bank, Fort Morgan, Colorado, as trustee of said bonds for the sale thereof, and by the said Morgan County National Bank to be delivered to the parties of the first part, and said parties of the first part to immediately re-deliver, or cause to be re-delivered, to the said bank, to be held as a trustee for the sale of the said bonds, to be by it pooled with all other bonds, of said district and delivered to it for the purpose of sale, and all of said bonds to be sold upon the same terms, and conditions, and for the same price obtained for other bonds of said district so left in the hands of said trustee for sale; and that thereafter when the sale of such bonds is made, then the proceeds received from the sale of said bonds so sold less the necessary commissions, if any be paid, shall be construed to be net proceeds and shall be turned over

to the parties of the first part, to be divided by them in pursuance to their own agreement.''

The bonds called for by these contracts, together with $2,000 additional bonds of the same issue, not involved herein, were entrusted to, and received by, the aforesaid bank in one lot, but neither the bank nor any of its officers made any attempt at that time to find a purchaser for the bonds. Thereafter, at the suggestion of one Dailey, a prospective sub-contractor on the project, Dregman, about the middle of June, after unsuccessful efforts upon his part to sell the bonds, called upon Roediger in the bank, and he agreed to sell the same, Dregman contending that Roediger agreed that the efforts of himself and the bank in selling the bonds would be without charge, as the irrigation project would be a great benefit to the community. This was denied by Roediger. It was, however, agreed that if Roediger secured a prospective buyer, Dregman would give him an option upon the bonds. Dregman testified that he told Roediger that he could not take less than seventy-five cents on the dollar of the face value of the bonds, but wanted all he could get. Thereupon Roediger, on the stationery of the Morgan County National Bank, having thereon the names and the official designation of the various officers of the bank, including that of Roediger as cashier, wrote the National City Bank of New York stating, *inter alia,* that, ''We are offering for sale'' the aforesaid bonds, and signed the same in his official capacity. This letter was referred to Bert Clarke & Company of Chicago, who thereupon wrote to the ''Morgan County National Bank, Fort Morgan, Colorado,'' referring to the aforesaid letter as having received ''your letter.'' Roediger replied to the Bert Clarke letter, saying, *inter alia,* ''We beg to acknowledge receipt of yours,'' etc., and stating, ''We can offer you these bonds, subject to prior

sale, at eighty-five cents," etc., and signed the same in his official capacity. Thereupon Bert Clarke & Company transmitted to the Morgan County National Bank a telegram stating that they would take the entire issue of bonds, subject to examination of property, and approval of legality of the bonds. This telegram was delivered to the bank on July 4th and by it forwarded to Roediger, who was then in Lincoln, Nebraska. Roediger thereupon acknowledged, by wire, to Bert Clarke & Company, receipt of the telegram, signing the message in his official capacity as cashier of the Morgan County National Bank. At the same time, without attaching to his signature his official position in the bank, he wired Dregman at Fort Morgan stating that he had a purchaser for the entire issue of bonds, saying further, "Wire me option seventy-five cents. Keep strictly confidential." Dregman thereupon wired Roediger, "You have option on bonds until July twentieth, seventy-five cents." Upon the same day Roediger again wired Dregman, advising that he would arrive on the Tuesday following, with the buyer, to inspect the property, and also wrote Dregman a letter giving some advice relative to certain things to be done in furtherance of the sale, and further saying therein, "As per my two messages I have purchaser," etc., and further, "I am making deal with assistance of other parties, and they have accepted at eighty-five cents, with proviso of inspection." The next day Roediger arrived in Fort Morgan, and Dregman had a conversation with him relative to the letter and the sale of the bonds. In relation to this matter Dregman testified as follows: "I have given him an option at seventy-five cents, and I told him from his letter I noticed he had sold at eighty-five cents. I asked him to split the difference with me, and he said he could not, as he had to pay other parties who helped him sell the bonds. Nothing further said at that time."

Bert Clark and Roediger, on July 7th, examined the irrigation project, and on the next day entered into an agreement in relation to the sale of $227,000, face value of said bonds, for the sum of $192,950 and accrued interest to date of delivery at the Commercial National Bank in Chicago. The terms of the contract required Clark & Company to take $50,000 of said bonds on August 2, 1909, and $30,000 thereafter on the first day of each succeeding month until February 1, 1910, at which time they were to take the balance, $27,000, Clark & Company reserving the right to take and pay for all such bonds at any time after August 2nd, and before the designated dates of payment. This contract is in the form of a proposition addressed to Roediger, without reference to the bank or his official position therein, and signed "Bert Clark & Company." It bears the endorsement: "We accept the proposal above outlined, and will carry out its terms," and is signed "J. H. Roediger." Bert Clark testified that as the proposition was originally drafted by him, it was addressed to the bank and that at Roediger's request it was changed to Roediger; while Roediger testified that the agreement, as accepted, was in the form in which it had been originally prepared by Bert Clark. Contemporaneous with the execution of the aforesaid contract, Roediger entered into a contract of purchase of the same bonds from Dregman. This contract is dated July 8th, and is in the form of a proposition addressed to Dregman, signed "J. H. Roediger," and accepted by Dregman. There is a dispute between Dregman and Roediger as to the dates of the delivery of the bonds as contained in this contract when it was executed. Dregman contends that the dates as originally written were co-incident with the dates of the delivery specified in the Bert Clark-Roediger contract, and that the dates actually appearing in ink in the contract, which were in each in-

stance fifteen days later, had been so changed without his knowledge, subsequent to the execution and delivery of the contract. Roediger claims that such changes had been made by him after the form of the contract had been written, but before it was submitted to Dregman and executed. Upon the execution and delivery of the aforesaid contracts of purchase, Bert Clark returned to Chicago, and subsequently much correspondence in relation to the bonds passed between him and Roediger, in none of which was Roediger addressed as cashier of the bank, nor did he so sign any such correspondence. Bert Clark, through his attorneys, made certain objections to the bonds and the project, but only for one day, and in one letter, on July 20th, was there any thought or expression from Clark that the objections would be unsurmountable or in any wise delay the taking over of the bonds. The correspondence of Roediger shows that he also shared the same belief. In fact, on July 13th Roediger wrote Clark, in answer to the latter's telegram, expressing the belief that as all papers were then in the hands of attorneys he had no doubt that they would hear favorably as to the legality of the bonds and approval of the project "within the next day or two," and on the 18th Clark wrote Roediger, in answer to the latter's letter of the 16th forwarding certain papers, that the same had been received, turned over to the attorneys, and he expected to receive a favorable reply within a day or two, and desired to know if it would be satisfactory to Roediger to make delivery of "the bonds before August 1st." On July 20th Clark wrote Roediger the aforesaid letter expressing doubt whether the objections could be overcome, but on the next day, and before receipt of this letter, Roediger had a telegram from Clark advising that he had written a subsequent letter, and to await it. This letter Roediger received on July 23rd. Therein

Clark suggested a plan whereby the objections could be overcome, stating that he did not want to abandon the proposition. The method suggested by Clark of obviating the objections. was carried out. Several letters and telegrams passed between Clark and Roediger, stating, substantially, that corrections and papers supplied were satisfactory, Clark writing on July 26th that: "It is needless to say that we are pleased with this fortunate turn of the matter, as we had entertained considerable. doubt at one time as to the possibility of the deal going through." On July 30th, Clark wired Roediger to ship all the bonds, which he did. Roediger claims that he thereupon, on the same day, by letter,—an alleged copy of which he produced,—advised Dregman of Clark's request and the shipment of the bonds, and that he presumed that Clark would pay for some of them the first of the week, and that in such letter he requested Dregman to have a designated lawyer draw up a partnership agreement between the two. Dregman testified that he never received or heard of such letter.

After the receipt of the bonds by the Commercial National Bank of Chicago, Bert Clark & Company paid into that bank, to the credit of the Morgan County National Bank for all such bonds, the following: August 3, 1909, for $112,500 face value of bonds with interest, $96,806.25; August 5, 1909, $2,000 face value of bonds with interest, $1,721.66; August 13, 1909, $25,000 face value of bonds with interest, $21,545.75; August 28, 1909, $50,000 face value of bonds with interest, $43,233; September 13, 1909, $10,000 face value of bonds with interest, $8,670; September 23, 1909, $3,000 face value of bonds with interest, $2,607; December 1, 1909, $8,500 face value of bonds with interest, $7,225; February 28, 1910, $16,000 face value of bonds with interest, $13,832,

making a total of $227,000 in bonds face value, with interest, and the actual cash paid therefor, $195,640.66.

Dregman contends that he never knew of the delivery and payment of the bonds on the aforesaid dates until he ascertained such facts in July, 1911, but was, at the time such payments were made, told by Roediger that Bert Clark had been unable to "make good"; and that relying upon such representation and being under the necessity, by the terms of his construction contract, to begin work at once, and having no money for such purpose, not knowing the fact of the aforesaid payments, did, at Roediger's request, on August 7, 1909, enter into a partnership contract with him, wherein Dregman was designated as the "party of the first part" and Roediger "party of the second part" for the construction of said irrigation system, in compliance with the terms of the construction contract; that such partnership contract, *inter alia,* recites that:

"Whereas, the said W. A. Dregman has filed his bond in the sum of $20,000 payable to said Irrigation District as provided in said contract, and now desires to proceed with the work of construction at once and prior to the sale of the irrigation district bonds; and

Whereas, party of the first part desires to secure the necessary and proper funds in cash to proceed at once with said construction work and not await the sale of said bonds for that purpose; therefore:

The party of the first part * * * agrees to take second party into partnership in the entire enterprise and to share equally with him all profits and losses arising therefrom, and hereby assigns and conveys unto second party an undivided one-half interest in said construction contracts and all profits and benefits arising thereunder; and also assigns to second party one-half of

twenty-six water rights contracts numbered fifteen to forty, inclusive, of the Badger Reservoir Company. ·

In consideration of the foregoing, second party agrees to furnish all money needed to carry into effect all agreements and covenants made by the party of the first part with the Badger Irrigation District to enable the immediate prosecution of all the construction work, and for making payments from time to time on monthly estimates as the construction work progresses, the said money to be furnished by second party for all purposes named in said construction contract until such time hereafter as said bonds shall be sold and the proceeds therefrom realized for the purpose of continuing said work.''

On the next day after the partnership contract was entered into, Roediger wrote Bert Clark and Company saying, *inter alia*: ''Please do not inform anyone in this neck of the woods that you have purchased these bonds for a short time. I wish to get the contractor to construct the gates better than called for in plans and specifications required by the state engineer.'' In explanation of this letter Roediger testified that it was a subcontractor, and not the contractor, whom he wished to keep in ignorance of the sale of the bonds, though, as a matter of fact, at that time there had been no sub-contract let, but certain parties were negotiating contracts of that character. In the complaint it is alleged that the aforesaid partnership contract was entered into on August 7th, which fact is expressly admitted by Roediger, and the other defendants in their respective answers. Roediger, however, in his testimony claimed that before August 7th, that is, on about July 15th, he had a conversation with Dregman relative to the proposed partnership, at which time Dregman offered him $15,000 if he would advance the money necessary to carry on the work, and that he declined the offer, saying that he was

not in the reservoir building business; that later in the
day he told Dregman that he would think the matter
over, and afterwards went to Lincoln, Nebraska, and ar-
ranged to get some money as he needed it until the bonds
were sold; that upon his return, about the time of the re-
ceipt of the letter from Bert Clark saying the attorneys
would not approve the issue of bonds, he had another
talk with Dregman in which the latter said that he must
go to work or lose his contract, and offered to give the
former a one-half interest in the construction contract,
and Roediger said he would take the matter under ad-
visement; that Dregman had already read the aforesaid
letter and telegram from Clark, but not the second letter;
that thereafter "on the twenty-fifth of July Dregman
offered me, (Roediger), half of the profits aggregating
$55,000 to advance the money to go into the partnership."
Roediger further testified that he had shown Dregman
the telegram of August 3rd from Bert Clark, that the
bonds would be taken and that "before the contract was
made" Dregman had seen the telegram that the money
had been paid in for the bonds; that "on the 7th of Au-
gust, when we entered into the contract, Dregman knew
about the sale of the bonds, but that made no difference,
as he had made an option."   Dregman denies specifically
every material statement in the aforesaid testimony of
Roediger.   Some witnesses testified that they had heard
Dregman say prior to August 7th that the bonds were
sold, and also that he had entered into a partnership
with Roediger for the construction of the project, and
that Roediger was to advance the money, while an equal
number of witnesses testified that long after the 7th of
August, Roediger had stated that Bert Clark had "fallen
down" on taking the bonds, and that he, (Roediger), was
advancing the money.   The only consideration for the
partnership contract, Roediger says, was the agreement

on his part to advance the money to carry on the work, and that he advanced no money whatever. On the contrary, that the payments for the work of construction were made wholly out of the proceeds of the sale of the bonds.

On August 26th, long after the bonds were sold, a new contract for the sale thereof was entered into by Dregman and Roediger, the former claiming that it was made because of the representations made to him by the latter, that Bert Clark had not been able to dispose of the bonds, but could do so if given additional time, while Roediger contends that the new contract was made at the sole request of Dregman, that he might show it to certain sub-contractors, and thus mislead them as to the times the money would be received and could be paid to them. Roediger also testified that his sole purpose in making this new contract was to have inserted therein a clause referring to the partnership contract of August 7th, 1909, and declaring that the purchase of the bonds under the agreement of August 26th should not be affected by the partnership contract, which was a separate and distinct transaction. With this exception, and the further fact that Roediger reserved the right to take up the entire issue of the bonds at any time after the date of the contract, the sole difference between the prior contract and this one was a change in the amount of the monthly payments, the first payment under the latter contract being $25,000 instead of $50,000, and the second payment being $50,000 instead of $30,000, and subsequent payments being $25,000 instead of $30,000 until the last payment, which was $52,000 instead of $27,000. There was no evidence that Dregman or anyone else ever showed the aforesaid contract of August 26th to any subcontractor. Defendants admitted that 85c on the dollar, face value of the bonds, accrued interest, and in-

terest on the daily balance on the proceeds of said bonds, were credited to the defendant bank by the Commercial National Bank of Chicago, and subsequently all paid to defendant bank, and thereafter all over 75c on the dollar, face value of the bonds, was credited to Roediger's personal account.

The court made some findings of fact and declined to make others requested by plaintiffs. It is unnecessary, however, to consider these matters in detail, as the record requires us to affirm in part, and reverse in part the judgment in Case No. 8196, and to affirm the judgment in Case No. 8197. The court found that neither the bank nor More was a party to, or in any wise interested in, the option of sale, and subsequent contract and sale of the bonds entered into between Roediger and Dregman, and that the latter knowingly dealt with the former in relation thereto in his personal character, and not as a representative of the bank, and that Dregman was authorized to contract for the sale of the $21,000 face value of the bonds involved in case No. 8197 at the same price that he sold the $204,000 involved in case No. 8196, and that such was the understanding of the plaintiffs herein, and that Dregman did sell all such bonds "to Roediger, personally, for the same price and upon the same terms and conditions as he sold his own." The contracts under which all these bonds were placed with the Morgan County National Bank, as trustee, must be considered together. In fact, the one relating to the sale of the $21,000 of bonds is dependant upon, and in many important paticulars, governed by, the other. The latter contract expressly provided that from the time of the delivery of the bonds to the bank, Dregman should be deemed to be the owner thereof, and should have the exclusive right to sell and dispose of the same or any part thereof, and upon such sale, at not less than

70 per cent of their face value, (exclusive of interest payments), the bank should deliver said bonds, or the portion thereof so sold, to the purchaser upon the payment to it of the purchase price. While this contract states that the bank is trustee for the sale of the bonds, other portions thereof clearly disclose that it had no authority to sell the same, but, on the contrary, that such authority was expressly and exclusively invested in Dregman. The other contract, after expressly referring to the aforesaid contract under which the $204,000 in bonds was placed with the bank, required the $21,000 in bonds therein specified, to be also placed with said bank as trustee for the sale thereof. Nevertheless, it further required that said bonds be "pooled with all other bonds of said district which were delivered to the bank for the purpose of sale, and all of said bonds to be sold upon the same terms and conditions and for the same price obtained for other bonds of said district, so left in the hands of said trustee for sale." It, therefore, follows that as Dregman had the exclusive right to fix the sale price of the $204,-000 in bonds, with the limitation hereinbefore noted, and to sell the same, and the $21,000 in bonds were required to be pooled with all other bonds of said district left with said bank for sale, and sold upon the same terms and conditions and for the same price obtained for such other bonds, he possessed full authority to fix the price and sell all such bonds so pooled. Moreover, such is the construction placed upon these contracts by the parties themselves. The bonds called for by both of these contracts were deposited with the bank in one lot without designation or segregation. In subsequent proceedings Dregman exercised the power of sale over all such bonds. He owned an equal interest with the Clarks and Stemen in the $21,000 in bonds, and the latter apparently acquiesced in everything that the former did in

relation thereto. Moreover, on September 16, 1909, the Badger Creek Reservoir Company secured a loan from the Morgan County National Bank, and as security therefor Dregman and the Clarks and Stemen gave an order, prepared by their attorneys, to the bank, as trustee, authorizing it as such to pay to the order of the bank, as lender of the money, the sum of the loan, out of any moneys due them, (in the proportion of their respective interests in the aforesaid $21,000 in bonds), "as trustee of bonds under an option to W. A. Dregman." Other orders of like character were thereafter given by the same parties to the bank for loans.

Roediger in no wise interested himself in the sale of the bonds until after Dregman and his associates had unsuccessfully endeavored to sell the same, and then only after being solicited to do so by Dregman. In relation to this matter Dregman testified as follows: "I heard Roediger testify that I had given him an option personally for those bonds, and the facts in that regard are, that, about the middle of June, Dailey came to me on the street and wanted me to go and see Roediger about the sale of the bonds. I had tried to place the bonds before that. I spoke to Carruth, cashier of the Savings Bank, and had the matter up with a man by the name of Haver in Denver. Went in to see Roediger about the middle of the month; do not remember the exact date; do not remember whether Dailey was with me or not. I told Roediger that Dailey had asked me to see him about the sale of the bonds, and asked if he thought he could do it. He said that he thought that he could, but that he could not do anything as long as other parties were trying to, and wanted an option. I told him as soon as he got a prospective buyer that looked good I would give him an option for a short time. He was in the bank in the cashier's department, and I went there. He did all.

the business on the part of the bank I ever did, or tried to do with it. I have not done any business with More personally for several years. Roediger said he would try and sell the bonds, had prospects, and would keep me posted. * * * I told Roediger I had to have 75c, that was the least I would take but wanted all I could get. Dailey was the one who suggested I see Roediger, saying that he thought that he could sell the bonds, and I solicited his assistance. * * * On July 4th I received Roediger's telegram and wired him an option." This testimony of Dregman's, coupled with the fact that the option of sale to Dregman and the contracts of sale following, make no reference to the bank or to the official position of Roediger therein, is sufficient to warrant the court in its findings in relation to this matter. Nor are we disposed to interfere with the findings that the bonds were sold to Roediger. Such is the claim of the latter, and there was evidence to support the claim, though a finding that he was simply an agent to negotiate a sale might have been more reasonable. We are also of the opinion that the finding of the court that the plaintiffs are not entitled to the interest paid on the proceeds of the sale of the bonds by the Commercial National Bank of Chicago, while the same remained there on deposit, is warranted by the evidence. The proceeds of the sale, covered by the construction contract, were by its terms to be held by the Morgan County National Bank, disbursed and paid out in a certain way therein designated, and no part thereof to be otherwise disbursed until the full completion of the terms of the construction contract. The $21,000 in bonds was to be pooled with the others, and when sale thereof was made, the proceeds were to be turned over to the owners of the bonds. The settlement as to the proceeds of the former bonds was actually made immediately upon the completion of

the construction work, and as to the latter, settlement was had sometime before the entire purchase price of the bonds was paid by Bert Clark & Company, and there is no express requirement in the contract that proportionate payments should be made. The fact that the Morgan County National Bank permitted Roediger to appropriate such funds to his own use is of no concern to the plaintiffs, but is a matter solely between that bank and Roediger.

In the former opinion we stated that the written contract of sale between Roediger and Dregman required the former to pay the latter a designated sum for the bonds "and accrued interest from the date of the bonds to the date of the delivery of the same." This was not correct. The contract required Roediger to pay Dregman the designated sum and accrued interest only from the date specified in the contract for the delivery of the bonds to the date of the delivery of the same. As all payments were made within the time provided for in the contract, there was no accrued interest payable to Dregman or to those whom he represented.

The court, as hereinbefore stated, found that Dregman, on account of his conduct with respect to the Federal suit, was estopped from prosecuting either cause of action. In this we think the court was in error, as that which was pleaded or proven in no wise constituted an estoppel. The allegations of the answers in that regard are that Bert Clark brought a suit in the Federal Court against the defendants herein, for the recovery of the purchase price paid by him for said bonds, because of certain fraudulent representations made to him by the defendants, including those made in a letter of July 1st, set forth in the amended complaint in this suit; that the issue was joined thereon, trial had, resulting in a verdict against the bank and Roediger, that the jury therein

"must necessarily have found" that some statements, (without alleging what they were), contained in the aforesaid letter, were false and untrue, that before Roediger made any representations to Bert Clark in said letter he conferred with Dregman, and obtained from him all the information therein contained, that from a time prior to the institution of such Federal suit until the trial thereof, Dregman and his attorneys consorted with Clark and his attorneys, and Dregman was a willing witness, and furnished Clark evidence tending to support the allegations of Clark's complaint, (without alleging what they were), and furnished correspondence that had passed between Roediger and the plaintiff herein, respecting the sale of said bonds, which correspondence was introduced in evidence in the Federal trial; that after the verdict of the jury and under the compulsion thereof, Roediger paid to Bert Clark a certain sum of money in order to secure a release of Clark's claim and demand against defendants therein. After an unsuccessful effort to strike this defense, because of its irrelevancy and immateriality, the plaintiff in this cause demurred thereto on the ground that the facts stated constituted no defense to plaintiff's cause of action. The demurrer was overruled, and in his replication the plaintiff denied that the jury returned a verdict in the Federal suit against defendant bank and Roediger, on account of any representations made by Roediger which he obtained from plaintiff, denied that he furnished any evidence to support the allegations of the plaintiff in that suit, or any evidence whatever, save and except a letter hereinbefore referred to, written by Roediger from Lincoln on July 4th to Dregman, denied that he or his attorneys encouraged and assisted Clark in the prosecution of his suit, except that he appeared as a witness in said cause. Dregman's evidence given in the Federal suit was, together

with the pleadings in that suit, over the objection of plaintiff herein, admitted in evidence in the case at bar. From all the evidence in the record it conclusively appears that Dregman did not make any representations whatever or furnish Roediger with any information contained in the aforesaid letter of July 1st of which Bert Clark complained in the Federal suit. On the contrary, Roediger admits in his testimony that the information that Clark claimed was false, contained in this letter, was obtained from other sources, and that while Dregman said something about the water supply, he could not remember exactly what it was, and it made no impression on his mind, and that he did not rely on what Dregman said. In fact, we feel quite certain that the matters covered in this letter were, at the time, within the personal knowledge of Roediger. He testified that while he asked relative to the water rights owned by the district and was told by Tuke, the president of the Irrigation District, that it included all the flow of Badger Creek, he, nevertheless, personally knew that certain individuals had filings on the stream, and irrigated therefrom, and was told by Tuke that they had no storage right, and that the water flowed back into the creek, "and in that way the district had the entire flow of the Badger Creek." He also admitted his personal knowledge of the acreage in the district subject to irrigation, the prices at which irrigated and non-irrigated land sold, and, from statements of people who lived on the stream, of floods coming down year after year, and that he so explained all these matters fully to Mr. Clark before the latter purchased the bonds. Moreover, it was contended by the defendants in the Federal suit that all information given Bert Clark in that letter concerning the irrigation district, the lands, bonds, and water supply, was true, and that he was given the fullest opportunity to, and

did, investigate for himself all such matters, and they still, at the time of the trial of the case at bar, believe that under the evidence introduced in the Federal suit, the plaintiff therein was not entitled to a verdict, and that an appellate tribunal would have reversed a judgment entered on that verdict. Moreover, that verdict was set aside by stipulation of the parties thereto, and as testified by Roediger he paid a large sum as the consideration for such stipulation "principally on account of Mr. More and the bank. On account of the bank because it interfered with business. Because of Mr. More and his age, and that he had nothing to do with it. * * * because Mr. More would have worried himself to death." Moreover, while Roediger's contract of purchase was conditioned upon approval of the bond issue, etc., he made no objections to the legality of the bonds or of the project. On the contrary, his letters to Bert Clark constantly expressed his approval of the same, and the only complaint in relation to the matter came from Clark. In substantial effect, the finding of the trial court is that Dregman, plaintiff herein, sold bonds to Roediger, of which said Roediger in no sense complains, and the latter thereafter sold the same bonds to another party, who thereafter brought a suit against Roediger to recover the purchase price he paid for the bonds, on the grounds of fraudulent representations made to him by such seller, and the plaintiff herein appeared in that suit and testified to actual facts, he is thereby estopped from recovering over $15,000 earned by him in the construction of an irrigation system in the district issuing such bonds, and which was erroneously and without consideration paid over to Roediger. We cannot sanction such finding. Dregman was not a party to the Federal suit. He was given no opportunity therein to prove that he was not responsible for any of the representations of which

complaint was there made. Moreover, the settlement following that suit was consummated by Roediger and the Bank, defendants therein, without the knowledge or participation of Dregman. Besides, Dregman's testimony therein related almost wholly to the contract for the sale by him of the bonds and certain lands in the district to Roediger, and in no sense as to the character of the irrigation project, or representations that had or had not been made in relation thereto. In fact, upon objection by defendants there, defendants in error here, he was not permitted to answer but few of the questions propounded to him, and there is no claim that he did not testify to the truth in relation to such matters. The production by Dregman in the Federal suit of Roediger's letter of July 4th, and telegrams constituting the option of sale of the bonds to Roediger, was not a wrong that will work an estoppel in this case. This is equally true of his other acts disclosed by the record herein. Furthermore, the alleged partnership between Dregman and Roediger was not for the purpose of selling the bonds or concealing any fact in relation thereto, but for constructing an irrigation system. The funds therefor were in the hands of a trustee, and as between the parties to this suit, it matters not from what source those funds were derived. Quoting from *Stewart v. Wright,* 147 Fed. 321, 77 C. C. A. 499:

"These conclusions are abundantly supported by authority. The rule which declares that when parties are in equal wrong the position of the defendant is the better, and that the courts will not allow their machinery to be used for the relief of one who has been defrauded in a corrupt or illegal transaction in which he participated, is based not upon statutory provisions, but upon general principles of public policy. It is therefore not for the sake of the defendant that the rule is enforced,.

but to promote the general good. And when the objection is urged by the defendant, or is suggested by the court of its own motion, two questions present themselves for consideration: Were the parties in equal wrong, or was there such fraud, deceit, oppression, or inequality as challenges the attention of a court of justice? If they appear to be in equal wrong, will nevertheless a wise regard for the general welfare be better subserved by the punishment of the defendant than by denial of relief to the complaining party? In 1 Story, Eq. Jur., § 300, it is said:

'And indeed in cases where both parties are in *delicto,* concurring in an illegal act, it does not always follow that they stand *in pari delicto,* for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, hardship, undue influence, or great inequality of condition or age, so that his guilt may be far less in degree than that of his associate in the offense. And, besides, there may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be.'

The same doctrine is recognized by Pomeroy:

'Even where the contracting parties are *in pari delicto,* the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him.' 2 Pomeroy Eq. Jur., § 941.

In *Reynell v. Sprye,* 1 DeG. M. & G. 660, 679, it was said: 'But where the parties to a contract against public policy, or illegal, are not *in pari delicto* (and they are not always so), and where public policy is considered as advanced by allowing either, or, at least, the more excus-

able of the two, to sue for relief against the transaction, relief is given to him, as we knew from various authorities, of which *Osborne v. Williams,* 18 Ves. 379, is one.' "

While the court declined to find whether the partnership contract of August 7th had been orally entered into in July, and only reduced to writing on the day it bears date, or whether the actual facts concerning the sale of the bonds had been concealed from Dregman by Roediger, we think such findings should have been made and entered, and that the evidence in relation to the matter warrants only the conclusion that the partnership contract was actually made on August 7th, and that the facts in relation to the prior payment for a large portion of the bonds was withheld from Dregman, and that such was the inducing cause of his entering into the partnership agreement. As to the making of the partnership contract, the pleadings raise no issue, but fix the date as August 7th, and the evidence convinces us that whatever conversation was had, if any, prior to that time between Roediger and Dregman in relation to a partnership, the former never consented to enter into such an agreement until he actually knew that the funds were in hand from the sale of the bonds. Many witnesses testified that he had stated long after August 7th that the bonds had not been sold. The fact, as testified by some witnesses, that Dregman had stated that the bonds were sold, is of little moment, as the record shows that after July 8th—the date of the Roediger-Bert Clark contract of purchase—until a short time before the date of the partnership contract, it was the general understanding that the bonds had been actually sold, and the money would be forthcoming on August 3rd. Moreover, the request of Roediger to Bert Clark, on the day after the partnership contract was entered into, to keep secret from the people in the Fort Morgan community the fact

of sale or payment for the bonds, coupled with the Roediger-Dregman contract of sale under date of August 26th. is convincing proof of Roediger's purpose to conceal and. misrepresent the facts relative to the sale of; and payment for the bonds, to the end that he might defraud. plaintiffs. His attempted explanation of these matters. is wholly improbable and unbelievable. As to the bonds. and the proceeds of the sale thereof, a trust existed between the bank and the plaintiffs herein, .in accordance with the terms of the contract under which the bonds. were placed with the bank. As soon as the bonds were sold the net proceeds thereof were the money or property of the plaintiffs herein, held by the bank for a particular purpose, and for which it must properly account. All acts in relation to such trust funds were the acts of the bank, as well as that of its officers, and the concealment of the reception of the funds by the bank constituted the proximate cause of the loss to Dregman; and. and as far as he is concerned the bank has never parted. with that portion of the funds taken possession of by its. cashier under the alleged partnership agreement. If a bank officer, in the apparent scope of his duties, makes. false and fraudulent assertions, in reliance upon which. a person acts to his injury, the bank is responsible therefor. Equity, public policy, and sound morals require that the bank, as well as its officer, be compelled to account for the trust fund, and it would be a reproach, to justice to hold otherwise. We are of the opinion that. plaintiff Dregman is entitled to judgment against Roediger and The Morgan County National Bank of Fort Morgan for the balance of the trust funds in its hands; to-wit: the alleged partnership profits which Roediger attempted to appropriate to his own use, together with. interest thereon from the date of the alleged partnership. settlement, and that in no other respects should the judg-

ments here involved be disturbed. We will, therefore, withdraw the former opinion, set aside the orders based thereon, affirm the judgment of the trial court in case No. 8197, and in the first cause of action in case No. 8196; and, in the second cause of action therein stated, we will annul the judgment and enter judgment in favor of plaintiff in error against defendants in error, The Morgan County National Bank of Fort Morgan and J. H. Roediger, for the sum of $15,856.42, admitted by Roediger to be one-half the alleged partnership profits, together with interest thereon at 8 per cent per annum from September 15, 1910, and dismiss the cause as to Susie M. Roediger, administratrix of the Estate of M. L. More, deceased, and deny the petition for rehearing in each case. And it is so ordered.

Chief Justice Gabbert and Mr. Justice Bailey concur.

Decided July 3rd, A. D. 1916. Rehearing denied July 2nd, A. D. 1917.