Mercantile Bank, Defendant in Error, *v.* John McCarthy et al., Plaintiffs in Error.

### June 10, 1879.

1. In an action against the maker and indorser of a promissory note, the statement of a demand is sufficient, without stating that presentment was made.

2. A notice of protest left with the person in charge at a well-known and regular place of business of the indorser is sufficient.

3. The exercise by the cashier of the power to pledge the bank's negotiable securities is *prima facie* evidence that he has such power.

4. Where the negotiable securities have been constantly pledged by the cashier under his written agreement, as cashier, with another bank, the bank making the advances may safely presume the consent of the directors, especially where the cashier is notoriously left to do all the outside business of the bank.

5. The bank making the advances is a purchaser for value of such negotiable paper, and takes it discharged of any equities.

Error to St. Louis Circuit Court.
*Affirmed.*

Eber Peacock, for plaintiffs in error: Presentment as well as demand must be pleaded. — *Draper* v. *Clemens*, 4 Mo. 52. The bank was not Kraft's place of business, in

the sense 'that notice of protest left there with the cashier would fix a liability upon him as indorser. — *Sanderson's Administrator* v. *Reinstadler*, 31 Mo. 483 ; *Bailey* v. *Bank*, 7 Mo. 467 ; *Linville* 'v. *Welch*, 28 Mo. 203 ; *Klein* v. *Boernstein*, 32 Mo. 311. It was intended that the Mercantile Bank should guarantee the checks of the Savings Institution ; so that the contract was void for want of consideration, and not being signed by the party to be charged therewith, was within the Statute of Frauds. — Wag. Stats. 657, sect. 7 ; *Canmann* v. *Brunswick*, 3 Mo. App. 586 ; *Beardslee* v. *Morgner*, 4 Mo. App. 139 ; *Vallé* v. *Kramer*, 4 Mo. App. 570 ; *Glenn* v. *Lehmen*, 54 Mo. 46. A bank cashier has no power to act outside of an express contract by which his powers are limited. — *Bank* v. *Schaumberg*, 38 Mo. 229 ; *Ringling* v. *Kohn*, 4 Mo. App. 59 ; Morse on Banks, 141, 142.

HITCHCOCK, LUBKE & PLAYER, for defendant in error : The contract of January 25, 1875, signed by the cashier, was binding upon the bank, because it fell within the line of the cashier's duties. — Ang. & Ames on Corp., sect. 300 ; Morse on Banks, 151 ; Field on Corp. 207. This note being negotiable in form and indorsed in blank, and having been delivered to the Mercantile Bank for collection and as collateral, and advances having been made in part on faith of this note, the Mercantile Bank became holder of the note for value. — *Logan* v. *Smith*, 62 Mo. 455 ; *Hamilton* v. *Marks*, 62 Mo. 167. The notice of protest was sufficient.— *Glasgow* v. *Pratte*, 8 Mo. 336 ; *Sanderson* v. *Reinstadler*, 31 Mo. 483 ; Pars. on Notes & Bills, 498 ; *Bank* v. *Lawrence*, 1 Pet. 580.

BAKEWELL, J., delivered the opinion of the court.

This action is against the maker and indorser of a promissory note. There was a verdict and judgment for plaintiff.

The petition alleges that, at the maturity of the note,

demand was duly and properly made. It is claimed that the pleader should have alleged presentment as well as demand, and that, not having done so, no proof of presentment or demand should have been received. Facts necessarily implied need not be stated. There can be no demand, in such a case, without presentment. It is not necessary to allege the acceptance of a bill in writing, when no other acceptance is valid. And where there can be no valid demand without presentment, it is enough to state a demand.

It is said that there was no evidence of service of notice upon the indorser. The indorser was president of the Farmers and Traders' Savings Institution, and also secretary and general manager of the Camp Spring Mill Company. He was at the mill during the day, and generally called at the bank every morning, remaining from a few' minutes to an hour or two, as business demanded. Just before the maturity of the note sued on, he had been unusually busy at the mill, and for a week or two had not called every day at the bank. Letters were left for him at the bank, and received by him there. Letters were also left for him at the mill. His testimony is that letters concerning his private business and the business of the mill were delivered at the mill, and letters addressed to him concerning the business of the bank were delivered at the bank. How the letter-carriers were enabled to make this discrimination is not explained. The notary who protested the note in suit knew that defendant had a place of business at the bank, and had left notices of protest of other notes, of which the one in suit was a renewal, at the bank, where defendant had received them. The notice in question was left at the bank in due time, and was there received by the cashier. It does not appear that it actually reached the indorser, and the testimony is conflicting as to whether the cashier informed him of the notice on the day it was received.

We think that reasonable diligence in serving the notice

was sufficiently shown. And this is sufficient. The holder is not bound to see that notice is brought home to the indorser. The bank appears to have been one of the regular and well-known places of business of the indorser, at which he was in the habit of calling for his mail, and at which the letter-carriers had been in the habit of leaving letters for him since the opening of the bank.

It appears from the evidence that the note in suit, which is a note for $2,200 at sixty days, dated December 6, 1875, made by McCarthy and indorsed by Kraft, was given to the Farmers and Traders' bank in renewal of a former note. Kraft was accommodation indorser. The Farmers and Traders' bank was at No. 2838, Market Street, and, for convenience sake, it made an arrangement with the Mercantile Bank that that bank should do its clearings; that is, the Mercantile Bank was to pay all checks of the Farmers and Traders' Savings Institution that came through the clearing-house for them, provided that institution would keep a sufficient cash balance in the Mercantile Bank to meet such checks. This arrangement was the result of a verbal understanding between the officers of both banks, and was made in 1873, and lasted until January 25, 1875. At that date the cashier of the Farmers and Traders' bank delivered to the Mercantile Bank a written instrument in the following words, dated the day of its delivery: —

"*Whereas*, The Mercantile Bank of St. Louis is discounting notes, bills of exchange, and other evidences of indebtedness on which the undersigned is or may become liable as maker, drawer, acceptor, indorser, or guarantor, and the undersigned is a depositor with said bank, and may become liable for bills or checks returned or paid through the clearing-house, overdrafts, or otherwise: —

" Now be it remembered, that in consideration of the accommodations extended by said bank, and the better and more effectual security of said bank upon any and all claims which may arise in its business with the undersigned upon

any account, or originating in any manner whatever, the un-
dersigned has deposited with said bank the following col-
lateral securities, to wit:—

"All notes, drafts, and other evidences of debt which the
Mercantile Bank holds, or which may be deposited from
time to time for collection with said bank for us, to be held
by said bank, so long as the business relations of the under-
signed with said bank shall continue, as security aforesaid,
and until all and every liability, fixed or contingent, shall
be fully satisfied and discharged."

This writing further provides for the sale of the securities
pledged, in case of any liability remaining unpaid for five
days; the proceeds to be applied to the discharge of such
liability, and the balance, less costs, to be paid to the
Farmers and Traders' Savings Institution. This instrument
is signed, "The Farmers and Traders' Savings Institution,
by Rud. H. Dreyer, cashier."

The evidence was that Dreyer, as cashier, had the general
management of the affairs of the bank. It did not appear
that the president or directors had any actual knowledge of
any new understanding or agreement in regard to the terms
on which the Mercantile Bank was doing the clearing for the
Farmers and Traders' Savings Institution, or of the writing
above set out.

At the time the note in suit was delivered to the Farmers
and Traders' Savings Institution it was delivered to the
Mercantile Bank, receipted for, and held as a collateral under
the written agreement. About the middle of December,
1875, there was an overdraft against the Farmers and
Traders' Savings Institution at the Mercantile Bank of
about $4,000; this was gradually increased until the Savings
Institution closed its doors on February 15, 1876, when the
overdraft had reached about $12,000. The president of
the Mercantile Bank remonstrated with the cashier of the
Farmers and Traders' Savings Institution, in December, as
to the overdraft, but was met with a plausible explanation;

the cashier, saying that he was a large stockholder in his own bank, deposited collaterals which he claimed to own, as additional security, with the Mercantile Bank.  Of these collaterals, a portion turned out to be the property of another person, and nothing was realized on the remaining collaterals, which were second mortgages, except as to $400, the value of some diamonds.  When the Farmers and Traders' Savings Institution closed, and at the date of the trial, it owed plaintiff about $10,000 for overdrafts. Kraft says he knew nothing about the overdrafts.  He admits that the books of the Farmers and Traders' Savings Institution showed the state of the account, and that he saw the account, and that it was correctly stated; but he says that he did not understand the account, owing to carelessness in examining it, and want of skill in book-keeping.  The cashier testified that he signed the agreement of January 25, in accordance with a previous verbal understanding with the Mercantile Bank.

On the day of the maturity of the note sued upon, Kraft handed to the cashier of the Farmers and Traders' Savings Institution the check of Kraft on the Exchange Bank for $500, and another note for $1,700 indorsed by Kraft, with directions to get McCarthy to sign the note.  This McCarthy refused to do.  The note, therefore, went to protest.  McCarthy executed a new note for $2,200, which is still held by the Farmers and Traders' Savings Institution.  The $500 check was deposited by the cashier, with other checks and funds generally, to the credit of the Farmers and Traders' Savings Institution, with the Mercantile Bank, without any explanation, and without asking that the payment be appropriated to the $2,200 note, or to any particular account.  The $500 was credited at the Farmers and Traders' Savings Institution on the back of the new note received from McCarthy.  Kraft states that he did not know that the $2,200 note was not taken up by the new note indorsed by him, until after the bank failed.  This failure was a week or so after the protest of the note.  Kraft had left the

whole matter of the renewal of the note with the cashier of the Savings Institution.

It is claimed by appellants that it does not appear that the plaintiff is holder for value of the note sued upon ; that at the date of its maturity it was held by the Farmers and Traders' Savings Institution, and was paid by the new note of $2,200, on which credit was given for the $500 paid by the check of Kraft.

It is contended that the document of January 25 is of no validity, because not signed by both of the contracting parties ; that it is a promise to pay the debt of another, and within the statute of frauds ; that there was no existing subject-matter for the contract at the time it was made, and that for this reason it is void ; that such a contract was *ultra vires* of the Farmers and Traders' Savings Institution ; and that the making of such an agreement for the Savings Institution was not within the scope of the agency of the cashier, and therefore not binding on the corporation.

Whether the agreement of January 25, 1875, was binding upon either bank, is not the question. The instrument was signed by the cashier pledging the note in suit ; and a pass-book was kept between the two banks, in which negotiable notes and drafts were regularly entered as deposited as collateral with the Mercantile Bank ; and such paper was from time to time deposited and pledged by the cashier of the Farmers and Traders' Savings Institution. This had been going on for ten months when the note in suit was deposited as a pledge, and upon the faith of the pledge of this note and of other collaterals, large advances were made by plaintiff. That in making an agreement with the bank to pledge the negotiable paper held by the Savings Institution, or deposited with it for collection, the cashier was not acting within the scope of his ordinary common-law functions as cashier, is not decisive of the rights of plaintiff. If it be conceded that a cashier has no inherent power to pledge negotiable paper, yet it is cer-

tain that if the bank decides to pledge such paper, the act would naturally be done through its cashier. His exercise of the power is *prima facie* evidence that he possesses it; and if he has exercised the power during a series of months, in virtue of a written agreement such as that offered in evidence, and under circumstances such that the president and directors of the bank must have been cognizant of his acts in this respect, so that a course of dealing was established of which the president and directors must be presumed to have had notice, it cannot be said that the person who, on the faith of this course of dealing, accepts such a pledge and makes advances upon it, is acting in bad faith.

If the directors of a bank have for many years allowed the cashier to do all the business of the bank, they are held to have conferred on him authority to do everything which the charter or general law does not absolutely forbid a cashier to do, and his acts bind the bank. Morse on Banks, 168, and cases cited. Much more may it be held that where, in accordance with the terms of a written agreement entered into by the cashier, negotiable notes held by one bank have been constantly pledged, through the cashier, with another bank to secure advances, the bank making the advances may safely presume that this is done with the consent of the directors, where no notice is received to the contrary, and the course of dealing is such that the officers of the bank, if ordinarily vigilant, cannot be ignorant of the disposition which the cashier is thus making of the negotiable paper which is owned by, or in the custody of, the bank.

The instruction given by the court as to this branch of the case is as follows : —

"If Rudolph H. Dreyer was cashier of the Farmers and Traders' Savings Institution, in charge of the affairs of the bank as such, and as such signed on behalf of said institution the written contract of date January 25, 1875, here read in evidence, and delivered the same to plaintiff, and that said contract was used and acted under by said banks, then such contract was the act of said institution, and

binding upon it, and sufficient in law to pass to plaintiff title to the note here sued on, provided said note was the property of said institution, and was passed to plaintiff as collateral security for overdrafts, as claimed by plaintiff.''

We think that this instruction was warranted by the evidence. There was certainly testimony tending to show that the agreement to deposit collaterals had been openly acted upon by the cashier is such a way that it must have come to the knowledge of an ordinarily vigilant directory, and that on the faith of the pledge of these collaterals advances had been constantly made in accordance with the terms of the written agreement. The agreement between Dreyer and plaintiff, thus acted upon for a period of nearly a year without objection on the part of the Savings Institution, bound that institution so far as this : that if the note in suit was pledged by Dreyer as cashier of the bank, to plaintiffs, as collateral security for overdrafts by the institution, the act of Dreyer in making the pledge must be regarded as authorized by the Savings Institution. The language of the instruction may be open to criticism, but the jury could not be misled as to its real meaning.

The judgment of the Circuit Court is affirmed. All the judges concur.