BANK OF AMSTERDAM, Appellant, v. CARL WELLIVER and BURDEE M. WELLIVER, Respondents.*

In the Kansas City Court of Appeals, December 3, 1923.

1. **BILLS AND NOTES:** Evidence Held to Justify Finding That Under an Agreement with Bank's Cashier, Makers Were Released from Their Indebtedness on Note. In an action to recover a balance due on a promissory note, *held* evidence sufficient to justify finding that under an agreement with cashier of plaintiff's bank, defendants were released from their indebtedness in consideration of conveyance by them to bank of their residence and the sale of a half interest in a garage.

2. **BANKS AND BANKING:** Authority of Cashier Stated: Estoppel: Bank May be Estopped from Collecting Debt by Acts and Represen-

tations of Its Cashier Made in Line of His Duty. A cashier of a bank has no power, merely by virtue of his office, to do an act outside the scope of his ordinary duties as cashier, and ordinarily he has no power to discharge a debtor without payment, nor to release a surety, though the bank may be estopped from collecting such debt by reason of the acts and representations made by the cashier in the line of his duty, and where directors have permitted cashier to take general charge of bank, they are *held* to have conferred on him authority to do everything which the charter or general law does not absolutely forbid a cashier to do, and his acts bind the bank.

3. ———: ———: ———: Scope of Authority: Bank Estopped to Deny Authority of Cashier in Making Agreement Releasing Makers of Note and Statutory Provisions with Respect to Power of Cashier and as to Conveyances to Bank, Held Not to Render Agreement Unlawful. Where the evidence showed that it was practice of the former cashier and the present cashier of the bank to sell property without obtaining instructions from the directors but to thereafter report the same, and where bank's cashier made an agreement with makers of a note to release them from their indebtedness, in consideration of the conveyance to bank of their residence and a half interest in a garage, etc., the bank, after performance by makers, sale of realty by the cashier and payment of proceeds to the bank, cannot be heard to deny the authority of its cashier to act as its agent in making the agreement, notwithstanding section 11792, Revised Statutes 1919, depriving a cashier of power to "indorse, pledge or hypothecate" notes without written authority from the board of directors, and section 11739, directing that all real estate purchased by a bank or taken by it in settlement of debts shall be conveyed to it directly by name.

4. ———: Estoppel: Scope of Authority: Bank Cannot Deny Authority of Cashier Where it Retains the Benefits of His Act. A bank cannot be heard to deny the authority of its cashier to act as its agent, while at the same time it receives and holds on to the benefits thereof.

5. NOTICE: Cashier's Knowledge of Transaction with Bank Held Imputed to Bank. Where cashier was in full charge of management of bank, his knowledge of character of transaction with bank was the bank's knowledge, even though he did not actually tell the directors thereof until after he had consummated the same.

6. INSTRUCTIONS: Ratification: Instructions Dealing with Question of Ratification Which was not Pleaded, Held under the Facts not to be Improper. Instructions dealing with question of ratification by bank in holding on to the proceeds of transaction made by its

cashier, though ratification was not pleaded by defendants, were not erroneous, where the isue of ratification was brought into case by bank in its reply, particularly in view of the control and management of the bank accorded to cashier.

7. **EVIDENCE: Value of Residence and Garage Held Admissible on Question Whether There Was an Agreement Made by Cashier with Makers of Note.** In an action to recover balance due on note, where defense was that the note was discharged by conveyance of makers residence and interest in garage to bank under agreement with its cashier, evidence of value of the residence and garage was admissible as bearing upon the question whether cashier would make such an agreement.

*Headnote 1. Bills & Notes, 8 C. J., Section 1366; 2. Banks & Banking, 7 C. J., Sections 160, 161, 163; 3. Banks & Banking, 7 C. J., Sections 142, 160, 163; 4. Banks & Banking, 7 C. J., Sections 141, 142; 5. Banks & Banking, 7 C. J., Section 134; 6. Agency, 2 C. J., Section 737; 7. Banks & Banking, 7 C. J., Section 569.

Appeal from Circuit Court of Bates County.—*Hon. C A. Calvird*, Judge.

AFFIRMED.

*Silvers & Silvers* for appellant.

*DeArmond & Maxey* for respondents.

TRIMBLE, P. J.—This is an action to recover a balance of $3185.70 alleged to be due plaintiff bank on a promissory note of $4187, dated October 31, 1921, due six months after date, executed to the bank by the defendants Carl Welliver and Burdee M. Welliver, his wife. The note appears to be a renewal of a former note for the same amount, dated December 31, 1919.

Defendants set up that they were released from said indebtedness, and that said note was to be surrendered to them pursuant to a proposal made by plaintiff's cashier, F. E. Alder, to defendants, and agreed to and performed by them, that if defendants would convey by warranty deed to plaintiff, or to some one for plaintiff, their residence in Amsterdam, Mo., and Carl Welliver

would execute his note to the bank for $500 and would furthermore convey his half interest in a garage known as "The Peoples Garage" in Amsterdam, Mo., to his copartner Edgar Smiser, the latter would assume and agree to pay all of the indebtedness of the garage and plaintiff would accept him in lieu of defendants and would deliver to defendants the promissory note held by plaintiff against them, and defendants' indebtedness to the bank would thereby be fully discharged.

Plaintiff's reply denied that the cashier made any such agreement, and further set up that if such agreement was made, it was beyond the power of the cashier to make, since he was not authorized to do so by the Board of Directors and his act in so doing, if he did it, was never ratified by the board.

After a trial, the jury returned a verdict for defendants, and the Bank has appealed.

Several years prior to the date of the note sued on herein, one Moore owned a half interest in a garage in Amsterdam, Mo., known as "The Peoples Garage" and Edgar Smiser owned the other half.

The garage was indebted to the bank. Defendant Carl Welliver bought Moore's half interest in the garage and gave his note to the bank for one-half of the garage indebtedness, and the Bank released Moore from all of said indebtedness. In other words, as to Moore's interest in the garage and his half of the garage indebtedness to the bank, Moore stepped out and Carl Welliver stepped in, all with the knowledge, consent and approval of the Bank.

Thereafter further indebtedness accrued against the garage, and Carl Welliver owed a note of $500 to the bank and another note of $450. The $500 note is not involved herein and the $450 note was paid off and marked paid in January, 1921.

On January 7, 1921, defendants executed to the bank a deed of trust on their residence property in Amsterdam, securing a note for $1500 which stated on the margin thereof that it was given as collateral security for the

note of $4187.50, dated December 31, 1919; and this note
and deed of trust continued to be held by the Bank as
collateral security for the renewal note which is sued on
herein.

There is no dispute over the above and foregoing
facts. Neither is it disputed that on March. 18, 1922,
the defendants did convey their residence to F. E. Alder
who took and held it for the bank, and said defendants
also entered into a written agreement with Smiser where-
by, "in consideration of $1 and other considerations as
listed below," said defendants agreed to convey to
Smiser the garage building and to execute a bill of sale
to him for all of Carl Welliver's interest in the personal
property of said garage, consisting of "all the equip-
ment, fixtures and stock" and said Smiser agreed to as-
sume and pay all indebtedness of said garage and to re-
lease the Wellivers from any and all of such indebted-
ness. And said defendants, the next day, conveyed said
garage building and its stock and equipment to Smiser.
Said Carl Welliver also, at the time of making the deed
to Alder and the contract to sell to Smiser, executed a
note to the plaintiff bank for $500. The papers for these
various transactions were concededly all drawn by the
plaintiff's cashier F. E. Alder. On March 20, 1922,
Smiser, after obtaining Welliver's half interest in the
garage and contents, executed to the bank a deed of trust
on the former for $1000 and a chattel mortgage on the
latter for $1500.

Defendant Carl Welliver testified that Alder pro-
posed to them that if they would convey their residence
and would sell the half interest in the garage to Smiser
and execute to the bank the $500 note as above indicated,
the Bank would take Smiser for the indebtedness and
would surrender to Welliver his notes. In this he was
corroborated by Armentrout then assistant cashier in
the plaintiff bank. It was also corroborated by J. I.
Wolfe, an uncle of Mrs. Welliver, who afterwards went
to see Alder to obtain the surrender of the Welliver
notes which Alder had not surrendered; and he says

that Alder admitted that the agreement was as heretofore stated. We fail to find that the cashier anywhere denied this testimony on the part of Wolfe. The cashier denied, however, that any such agreement was made.

Defendants' testimony is that after they had performed their part of the agreement they asked for the notes the bank held, and the cashier told them he could not get them then as they were in the safe and it was locked; but he would get them in a few days and send them to defendants; that he told them not to worry about the notes for they were paid; that several times after that they saw him and he finally started to write a statement showing they were paid, but desisted, promising he would send the notes by mail.

It is conceded that on April 12, 1922, the cashier wrote to Carl Welliver saying: "I am sending herewith your note for $500 which has been marked paid. *I cannot send the others* until the Board of Directors have made arrangements to adjust the matter.

"Very truly yours,

"F. E. Alder, Cashier."

The cashier's explanation of this statement in his letter is that it referred only to the $450 note (which had been paid long before that) and to the $1500 collateral note. But inasmuch as the residence property securing this collateral note had been conveyed to Alder for the bank, which Alder says was done merely to save expense of foreclosure, it is not easy to see why these two notes, if they were all that were meant, should not have been returned to Welliver, nor what there was about them that the directors would have to make "arrangements to adjust."

It would seem there was ample evidence to justify the jury in finding that the cashier made the agreement contended for by defendants.

The cashier on May 29, 1922, sold the residence conveyed to him for the bank by defendants. He says the contract of sale was for $1200 and "that upon receiving

the proceeds'' he credited the note sued on herein with $1199.50 and turned the money over to the bank.

It is urged that the cashier was without authority or power to make such a contract if one was made. The transaction certainly does not come within section 11792, Revised Statutes 1919, depriving the cashier of power to "indorse, pledge or hypothecate" any notes of the bank without written record of authority from the board of directors. For here there was nothing of the sort, but rather a transaction whereby defendants paid their indebtedness to the bank by conveying their residence and garage property to the parties designated and executing Welliver's note for $500. However, aside from this statute, a cashier has no power, merely by virtue of his office, to do an act outside the scope of his ordinary duties as cashier. Ordinarily, he has no power to discharge a debtor without payment, nor to release a surety. [Peoples Savings Bank v. Hughes, 62 Mo. App. 576; Daviess County Savings Assn. v. Sailor, 62 Mo. 24; Bank of Mountain View v. McMinds, 210 Mo. App. 630, 634; Hodiamont Bank v. Franklin, 215 S. W. 503, 505.] Nor can he, ordinarily, release a debtor or a surety by a mere contract or promise, though the bank be estopped from collecting such debt by reason of the acts and representations made by the cashier in the line of his duty. [Bank of Neelyville v. Lee, 196 Mo. App. 496.]

But, in the case at bar, there is much room for the contention that this was not a mere agreement to *surrender* a note or to release the bank's debtor, but it was a *settlement* made by the cashier whereby he secured payment of at least a part of said indebtedness and secured another debtor in the place of the one released. It has been held that a cashier, who is the executive officer of the bank, may, in an effort to collect and secure the bank's indebtedness, exchange a note for a book account due the debtor, or in other words accept a book account in payment of a note. [Santa Fe, etc., Bank v. Dick, 73 Mo. App. 354.] According to plaintiff's testimony, there was much danger that Welliver would go into bankruptcy

as plaintiff's evidence shows he was threatening to do, and the cashier told him "it was very unwise, a very unwise way, for him to go out of the garage business;" that the bank would give him all the time he wanted on the notes; that if he went into bankruptcy it would throw Smiser in too without his being able to prevent it. This was before the agreement claimed by defendants was made and during the negotiations leading up to what was done between the parties. If, now, the cashier was seeking to make a settlement of matters for the bank, and, under the situation there presented, he made the agreement in the effort to preserve the bank's interest, ought it to be said, as a matter of law, that he had no power to make the arrangement it is claimed that he did make? But we need not decide this question, nor base the validity of the cashier's contract upon any such narrow ground. There are facts in the case which give it a far stronger foundation than that.

Pahlman, the bank's former cashier, testified that when Moore sold his half interest in the garage to Welliver, the bank took Welliver's note for Moore's half of the garage indebtedness and released Moore as has been hereinbefore stated. In other words, the bank did with Moore exactly what defendants claim it did with them. It allowed one debtor to step out and another to step in, save that in the last instance the Bank had Welliver and his wife to convey to the Bank their residence and to give Welliver's note for $500 in addition to conveying their half of the garage to the party selected. In addition to this, plaintiff's witnesses gave evidence showing that the cashier was "in charge of" and "guiding and running" the bank, that it was the practice of the former cashier Pahlman and also the present cashier to "have these transactions" and then report them *afterwards* to the board and that "in the bank business we (the directors) have to go by what they say." Moreover, the testimony of the cashier (plaintiff's witness) shows that he conducted the affairs of the bank without obtaining or waiting for instructions from the directors,

for concededly he took the deed from defendants to their residence property for and in behalf of the bank. And he did this and sold the property without consulting the directors and says he made no report whatever about the matter until after he had sold the house and had the proceeds. Thus the transaction which the cashier is charged to have had with defendants was not only in conformity with the practice of the bank which accepted defendants' note in lieu of Moore's note, but, by a course of usage, the cashier was, or had become, *the bank itself.* "If the directors of a bank have for many years allowed the cashier to do all the business of the bank, they are held to have conferred on him authority to do everything which the charter or general law does not absolutely forbid a cashier to do, and his acts bind the bank." [Mercantile Bank v. McCarthy, 7 Mo. App. 318, 325.] If the management of the bank is very largely given up to him, the bank may be held liable by showing that he is endowed with this larger power. [5 Cyc. 471.] "The cashier may have been allowed, by the directors, to take such general charge and management of the business of the bank as to bring such an agreement (to release debtors or sureties) within the scope of his agency." [5 R. C. L. 475, sec. 75; Cochecho National Bank v. Haskell, 51 N. H. 116, 122; Citizens Bank of Senath v. Douglass, 178 Mo. App. 664, 687.]

It is held in cases where a cashier, in the apparent scope of his duty, has made false and fraudulent assertions in reliance upon which a person acts to his injury, the bank is responsible therefor under rules of equity, public policy and sound morals. [Dregman v. Morgan County, etc., Bank, 162 Pac. 321.] It would seem that in view of the experience defendant Welliver had had in substituting his indebtedness for Moore's, and in view of the general charge and management of the bank confided to the cashier, the making of the contract claimed by defendants could readily be deemed to be within the scope of the cashier's authority; and after the defendants have, pursuant to such contract, executed the note

for $500 and have conveyed their residence to the bank, or, which is the same thing, to Alder for the bank, and after they have conveyed the garage and its contents to Smiser and the bank has obtained its deed of trust and chattel mortgage thereon from Smiser, it would be unjust to permit the bank to now say that the cashier had no power to make such an arrangement. [First Natl. Bank v. Wich, 160 Pac. 1036; Hobbes v. Boatright, 195 Mo. 693.] Furthermore, a bank cannot be heard to deny the authority of its cashier to act as its agent, while at the same time it receives and holds on to the benefits thereof. [Porter v. Farmers, etc., Bank, 120 N. W. 633; Hill v. Bank of Seneca, 87 Mo. App. 590; Swofford Bros. v. Bank of Blue Mound, 81 Mo. App. 46; Brennan v. Conn. Mut., etc., Ins. Co., 99 Mo. App. 718; Bennett v. Gage, 176 Pac. 744; Abmeyer v. German American Bank, 179 Pac. 368; Dillenbeck v. Herrold, 164 N. W. 869.] It will not do to say that since the directors may have thought the residence property had been deeded merely to save foreclosure and to effect a sale and a credit of the proceeds thereof on the note in controversy, therefore there was no holding on to the benefits of the cashier's agreement with knowledge thereof. As early as June 5, 1922, they knew what defendants were claiming in that regard and yet no move was made to restore to defendants what they had parted with on the strength of the agreement. Besides, since the cashier was allowed to be in full charge of and guiding and running the bank as it clearly appears that he was, he himself was the bank and his knowledge was the bank's knowledge even though he says he did not actually tell the directors anything about it until after he had exercised full authority over the residence property by selling it. In such case "his knowledge in the premises is imputed to the bank." [Citizens Bank of Senath v. Douglass, 178 Mo. App. 664, 687.] His acceptance of the proceeds of the agreement with defendants under the circumstances was the acceptance of the bank. [Hall v. Farmers, etc. Bank,

145 Mo. 418; Rhinehart v.. Peoples Bank, 89 Mo. App. 511.]

Section 11739, directing that all real estate purchased by a bank or taken by it in its own right in settlement of debts shall be conveyed to it directly by name and shall not be held longer than six years, does not operate to render the agreement between the cashier and defendants unlawful. Certainly not so as to render the agreement void after defendants' performance. Defendants' agreement was to convey to the bank or to some one for the bank, and the deed, at the suggestion of the cashier, was made to him. If there was any. violation of the statute it would seem to have been on the bank's side and the bank got the benefit of what was done. It is difficult to see how the bank could be permitted to receive the proceeds of the sale of defendants' home, and induce them to part with the property which was conveyed to Smiser at the bank's suggestion and to execute the $500 note, and then deny the legality of the settlement on the ground that the above section had been violated.

Complaint is made that the instructions treated or dealt with the question of ratification by the bank by holding on to the proceeds of the agreement when defendants did not plead ratification. However, the issue or question of ratification was brought into the case by plaintiff in its reply. It would seem that in view of the control and management of the bank accorded to the cashier, there was no real issue or question of ratification, and that the only vital issue was whether the cashier made the agreement defendants contend that he did.

The evidence offered by plaintiff as to value of the residence and garage was admissible as bearing upon the question whether plaintiff's cashier would make such an agreement, and the court very properly admitted it, but we fail to see how any question as to the value of these properties could destroy the agreement if it was in

fact made. The note in suit represented garage indebt-
edness since it was a renewal of Moore's share thereof
in which Wellivers were submitted in Moore's place, and
the loans for its purchase and for the conduct of its busi-
ness were made by plaintiff with full knowledge, or op-
portunities of knowledge, of its value or lack thereof.

The indebtedness in controversy was in reality
garage indebtedness, even though technically the fact
that Wellivers gave their note for half of it made it
their indebtedness; but if the agreement was made, there
could be no question but that the indebtedness in con-
troversy was meant and included in it.

We are of the opinion that the judgment should be
affirmed. It is so ordered. All concur.